## JOHN A. QUINN *v.* REGINA H. QUINN

[No. 481, September Term, 1970.]

*Decided April 26, 1971.*

640

The cause was argued before MURPHY, C.J., and MORTON, ORTH, THOMPSON, and MOYLAN, JJ.

*Warren K. Kaplan,* with *John Alexander* on the brief, for appellant.

*Ferdinand J. Mack* for appellee.

MURPHY, C.J., delivered the opinion of the Court.

By decree of the Circuit Court for Montgomery County dated June 15, 1970, appellee Regina Quinn (the wife) was awarded a divorce *a mensa et thoro* from appellant John Quinn (the husband) on the ground of constructive desertion. The husband has appealed from that part of the decree (a) awarding alimony to the wife of $4,000 monthly, and (b) awarding a $15,000 counsel fee to the wife's attorney. He claims that both awards were grossly excessive.

The parties, each now fifty-six years of age, were married in 1939. A son, the only child of the marriage, is now an adult. The parties separated in 1967. The wife filed her bill of complaint on July 7, 1967; the husband filed a cross-bill for divorce and a supplemental bill alleging desertion and voluntary separation. The case

was tried over a five-day period in September of 1969. Extensive testimony and documentary evidence was adduced by both parties. The Chancellor held the case *sub curia* until June 15, 1970 when he filed a written opinion in support of his decree. The husband entered an appeal from the court's decree on July 14, 1970. On the same day, he petitioned the Chancellor to modify the amount of the alimony and counsel fee awards. He claimed that after the trial, in January of 1970, he suffered a severe heart attack which left him permanently and totally disabled. A certificate to that effect from the husband's physician was filed with the petition. The Chancellor refused to consider the petition on the ground that he was without jurisdiction because of the pendency of the appeal. In so concluding, the Chancellor was in error since the pendency of the appeal does not divest the Chancellor of jurisdiction to modify the alimony award where there is a change in financial circumstances warranting that action. *See Lewis v. Lewis*, 219 Md. 313; *Hornstein v. Hornstein*, 195 Md. 627; *Dougherty v. Dougherty*, 187 Md. 21. In any event, since neither party has urged that we remand the case to the Chancellor for reconsideration of the petition for modification, we shall consider the court's decree in light of the evidence adduced at the trial, and give no consideration to the allegation that the husband is now totally and permanently disabled. *Cf. Garner v. Garner*, 257 Md. 723.

## The Alimony Award

In contending that the alimony award of $4,000 per month was grossly excessive, the husband claims (1) that the Chancellor distorted the amount of his income by adding thereto the retained earnings of the corporation of which he was the sole stockholder; (2) that the award far exceeded the wife's needs and thus permitted her to maintain a standard of living to which she had not been previously accustomed; (3) that the husband's ability to work has been impaired, while the wife suffers from no such disability, and (4) that the Chancellor failed to

consider the fact that the wife's conduct materially contributed to the fault which destroyed the marriage.

Maryland Code, Article 16, Section 5, directs that the court not award alimony "unless it shall appear from the evidence that the wife's income is insufficient to care for her needs." It is thus altogether plain that alimony is not to be awarded as a punitive measure. *Bowis v. Bowis,* 259 Md. 41. Rather, it is an allowance to the wife in recognition of the husband's common law liability to support her; it is an allowance of money payable at stated periods by the husband to the wife for her support during their joint lives so long as they live apart. *Fairbank v. Fairbank,* 169 Md. 212. In other words, the sole object of the alimony award is to provide an allowance to the wife for food, clothing, habitation, and other necessities. *Dougherty v. Dougherty, supra; Hood v. Hood,* 138 Md. 355. It was held in *Waters v. Waters,* 191 Md. 436, that in determining an award of alimony and whether, under the statute, the wife's income "is insufficient to care for her needs," the court should consider the husband's wealth and earning capacity, the assets and income of the wife, the station in life of the parties, their age, physical condition, and ability to work, the length of time the parties lived together, the circumstances leading up to the divorce, and the fault which destroyed the home. To the same effect, *see Burton v. Burton,* 253 Md. 233; *Newmeyer v. Newmeyer,* 216 Md. 431. The husband's overall financial ability to support (and not merely his current income), and the wife's need for support are controlling factors. *Willoughby v. Willoughby,* 256 Md. 590; *Pet v. Pet,* 238 Md. 492; *Gosnell v. Gosnell,* 208 Md. 179; *Lopez v. Lopez,* 206 Md. 509. In view of the variable factors to be considered in determining the alimony award, no fixed rule exists whereby the amount of the award is based on a percentage of the husband's wealth or income. *Bowis v. Bowis, supra.* Because each factual situation in determining an award of alimony is unique, making inappropriate the application of any mechanical or rigid formula, the Chancellor is necessarily entrusted with wide discretion

which should not be disturbed on appeal unless it was arbitrarily used or his judgment clearly wrong. *Blumenthal v. Blumenthal,* 258 Md. 534; *Willoughby v. Willoughby, supra.*

The voluminous record in this case discloses that the husband is in complete control of John A. Quinn, Inc., a mechanical contracting corporation of which he owns all the stock. His assets were put at $2,489,565 by his wife's accountant, while his own accountant put them at approximately 1.4 million. Much of the difference relates to the disputed value of the stock of the husband's corporation. The wife's accountant valued the corporation at $1,606,770; the husband's accountant valued it at $537,-601.

As President of the corporation, the husband receives, and has received for the past three years, an annual salary of $65,000. A joint federal income tax return filed by the parties for 1968 showed, in addition to the husband's corporate salary, dividends and interest income of $4,900 (none of it paid by the husband's corporation), net rental income on jointly owned real property amounting to $22,909, and a taxable capital gain of $3,047. The adjusted gross income of the parties amounted to $55,497; it reflected a loss of $40,384 from a personal venture. After allowance for deductions and personal exemptions, a taxable income of $27,369 was computed upon which a federal tax of $7,388 was paid.

The husband's corporation reported an after-tax net profit for each of the five years between that ending September 30, 1964 through that ending September 30, 1968 of, respectively, $70,090, $77,837, $71,318, $34,595, and $77,524. The corporation paid no dividends in 1964, 1966, 1967, or 1968.[1]

Thomas O'Neil, the wife's accountant, testified that the corporation's reported net income for the years 1966, 1967, and 1968 should have been adjusted by adding

1. The corporation paid dividends in 1965 in the amount of $46,000.

thereto certain of its joint venture (paper) losses,[2] and when this was done, the corporation had an average adjusted annual net income for the five-year period of $101,926 and an average annual net income of $113,656.[3] In calculating the husband's "cash flow" for 1968, *viz.*, the sources of all money "available" to him for his personal use, O'Neil included his estimation of the corporation's average annual net income of $113,656, as well as the husband's corporate salary of $65,000 and other reported income. O'Neil concluded that the husband's total cash flow in 1968 was $252,817; reduced by the husband's annual expenses, his net cash flow, according to O'Neil, was $144,493.[4]

The husband's accountant estimated the husband's net annual cash flow in 1968 at $47,747. His computation did not include any part of the retained earnings of the corporation since none were actually paid to or received by the husband.

The wife's assets consisted of stock and cash approximating $3,000 and her share of jointly owned real property, the total value of which, depending upon the method used to value the properties, was estimated at between $619,000 and $846,930, with encumbrances thereon between $214,000 and $241,130. In a schedule prepared by the wife prior to trial in preparation for a hearing on alimony *pendente lite,* she estimated her living expenses at $2,424.99 per month. This computation included estimated income taxes payable by the wife of $560 monthly. A compromise agreement was concluded between the parties calling for alimony *pendente lite* payments of $1,250 per month. This amount was paid for twenty-one

---

2. The corporation, in addition to its investment in stocks, had also invested in several joint ventures.

3. For the year ending September 30, 1968, O'Neil calculated the corporation's net income as $227,214, and not $77,524, as reported by the corporation. O'Neil's computation was reached by adding to net income before taxes joint venture losses of the corporation which amounted to $149,690. As indicated, the joint venture losses were paper losses not representing money actually paid out by the corporation.

4. One third of $144,493 amounts almost exactly to $48,000, the amount of the Chancellor's annual alimony award.

months prior to trial. There was evidence that during this period the wife lived generally within this allowance, spending a total of $26,078. At the trial, the wife submitted a revised schedule of her living expenses. It claimed a need for $6,755 monthly or $81,060 annually. This computation included estimated income taxes of $3,899 monthly, or $46,796 annually to be paid by her on that amount of income.

The evidence showed that that part of the jointly owned real property held for rental purposes produced net rentals of $22,909 in 1968 but that because of the high curtailment on the mortgages, the properties would currently yield a net of only $2,500 annually. Although the husband had offered to sell all these properties and divide the proceeds with the wife, she refused to accept his offer. Among the jointly owned real estate was the marital home valued at $35,000 and a summer home valued at $24,000.

In addition to his corporate assets and real estate holdings, the husband's other assets included $40,000 cash in the bank, substantial investments in stock and joint ventures, a pending small inheritance, and a $90,000 interest in a profit sharing trust of his corporation which would vest in him upon his retirement.

The Chancellor did not, in his opinion, outline the method by which he arrived at the $4,000 monthly alimony award. He made it clear, however, that he was considering the husband's "overall financial holdings" in determining his ability to pay alimony rather than merely his income. The Chancellor noted that in *Schuman v. Schuman*, 252 Md. 13, an award of alimony amounting to slightly more than one-third of the husband's income was approved, but stated "in this case a different set of circumstances exists" because the husband's income "does not accurately reflect his financial ability." He noted that the difference between the parties' accountants concerning the husband's net worth was "largely due to the fact that the husband has not included the assets of his business * * * to the extent of the wife's estimate." He noted

that the husband's corporation "has done well and has earned substantial profits"; that the corporation's net worth had increased at a rate of almost $175,000 a year; that the husband "is the sole owner of the corporate stock and makes all decisions in regard to disbursement of its funds, both in respect to his salary and dividends"; and that the husband "has at his disposal and makes use of the credit and funds of the corporation to defray many of his personal expenses." The Chancellor observed that the wife had virtually no income and that while her interest in the jointly held real estate was substantial, the husband had not accounted to her for any of the income produced by the properties. The Chancellor concluded that it would be "grossly unfair to deny the wife the advantages of the financial security to which she is entitled under the circumstances."

The husband contends that the Chancellor based his alimony award upon the combined amount of his personal income and that of the corporation. He argues that valid business reasons prevented him from receiving a salary greater than $65,000 per year or from declaring dividends from the corporation's earnings; that the corporation is required to retain a high level of liquid assets in order to meet bonding company requirements; that any salary received by him in excess of $65,000 per year would be considered as a dividend by the Internal Revenue Service and, hence, not a deductible expense to the corporation. The husband further argues that by attributing the corporation's retained earnings to him, the Chancellor improperly "pierced the corporate veil"; that while he owned all the corporation's stock, and controlled its activities, it was not shown that the corporate form was adopted or used to perpetrate a fraud upon the wife, or that the corporation's identity was ever ignored in carrying out its affairs. He claims that the Chancellor in effect awarded a portion of the earnings of the corporation to the wife and by so doing, gave the wife assets belonging solely to him, a practice specifically prohibited by the Maryland cases.

The wife argues that the Chancellor correctly concluded that the earnings available to the husband from his corporation should be considered in awarding alimony. She urges that the corporation's financial statements do not accurately reflect its worth, and that the husband did not adduce legally sufficient evidence to show any valid business reason for retaining corporate earnings to satisfy bonding company or other business requirements.

It is a general rule that a corporation, even if owned solely by one person, will be regarded as an independent person distinct from its shareholders, subject to exception only when necessary to prevent fraud or to enforce a paramount equity. *Lopez v. Lopez,* 250 Md. 491, 243 A. 2d 595 at p. 503, quoting from *Winand v. Case,* 154 F. Supp. 529, 540. Thus, where the corporate existence is used to perpetrate a fraud, or to hide or distort the truth, courts will look behind the mere artificial and formal body corporate and treat the corporation and the individual owning all its stock and assets as identical. *See Bauernschmidt v. Bauernschmidt,* 101 Md. 148; *Pott & Co. v. Schmucker,* 84 Md. 535. *Cf. Damazo v. Wahby,* 259 Md. 627.

The mere fact that the husband in this case controlled the corporation and owned all its stock would not, without more, justify attributing all the corporation's retained earnings to him for purposes of computing his overall financial ability to pay alimony. Nothing on the face of the record before us discloses any effort or attempt by the husband to misuse the corporate existence to avoid payment of alimony to his wife. Nor does the record show that the husband's corporate salary of $65,000 was less than reasonable compensation for his services.[5]

---

5. The Internal Revenue Code, 26 U.S.C.A., Section 162, allows corporations to deduct only a "reasonable allowance" for salaries paid for personal services rendered to the corporation. Salaries paid to corporate officers in closed corporations (such as John A. Quinn, Inc.) have always been subject to close scrutiny to insure that they are not in reality a distribution of corporate profits. See Annotation, 10 A.L.R.3d 125, entitled "The reasonableness of compensation paid to officers or employees, so as to warrant deduction thereof in computing employer's income tax." The cases collected

The sharp differences of opinion between the parties' accountants as to the value of the corporation's stock, and of the real amount of its annual retained net profits resulted mainly from the fact that the accountants applied different accounting principles and methods in reporting the financial effect of the corporation's various business transactions. But no showing was made, even remotely, that the corporation's accounting procedures were fraudulent, that its affairs were not being conducted in a reasonably sound business manner, or that its earnings were being deliberately manipulated to distort or debase the corporation's financial worth or that of the husband. There was testimony from the husband's accountant that bonding company requirements were such that the corporation could not pay dividends at the time of trial, if it was to retain its bonding eligibility.[6] A letter dated August 12, 1968 from the corporation's insurance brokers was introduced in evidence and supported the accountant's testimony. The letter indicated that a bonding line of credit had been secured for the corporation whereby the insurer would "entertain single jobs of $2,500,000 with a total work program of $6,000,000," provided "the current level of working capital and net within the corporation" was maintained. The letter cautioned against the corporation making any "major purchases or disbursements." While the letter was written a year before trial, and the corporation's financial picture had changed since that time, the record indicates to our satisfaction that the situation had not materially changed and that the corporation was still bound to observe the requirements outlined in the letter if it was to retain its bonding eligibility. We conclude that in retaining its earnings and not declaring a divi-

---

in the Annotation make it clear that the reasonableness of compensation paid an officer in a closed corporation so as to render it deductible as a corporate expense is a question of fact to be decided according to the particular circumstances of each case.

6. That corporations engaging in the construction trades are required to retain sufficient earnings to satisfy bonding company requirements is well recognized.

dend, the corporation's action was not unreasonable under the circumstances.[7]

We think the Chancellor included a significant portion of the corporation's retained net profits in determining the husband's overall financial ability to pay alimony to the wife. He specifically mentioned O'Neil's testimony that the husband's net cash flow in 1968 was $144,493. As heretofore indicated, this calculation was reached by including as income available to the husband the amount of $113,656, this being O'Neil's estimation of the corporation's five-year average annual net income. But, as we have observed, no part of this amount was ever received by the husband; indeed, had it been received as a dividend, only a small part of it would have been "available" to him, since in his tax bracket a large percentage of it would have been taken up by income taxes. Moreover, had such an amount actually been paid in dividends, the corporation would, by its accounting methods, have shown a net loss for 1968.

No useful purpose would be served by further specification of the evidence concerning the husband's finances adduced at the trial, or of the intricate arguments advanced by counsel on both sides with respect thereto. On the basis of the record before us, we conclude that the Chancellor overstated the husband's current overall financial ability to pay alimony by attributing to him substantial corporate profits not then reasonably available to him. We need not, however, undertake to determine with mathematical precision just how much money the husband has reasonably available to him with which to pay alimony to the wife. Under the facts of this case, it is obvious that neither the husband's taxable income or his adjusted gross income are reliable indicators in this re-

7. Under 26 U.S.C.A., Section 531, an accumulated earnings tax is imposed on corporations for the purpose of compelling the distribution of profits not reasonably needed for the conduct of its business; the tax is designed to deter use of the corporate entity by individuals so as to avoid personal income taxes. There was no evidence that the husband's corporation was required to pay any such tax on its retained earnings.

gard. At the least, in this case, the husband's gross salary and other current income must be taken into account in assessing his overall financial ability. But also to be taken into account, and considered along with the husband's financial condition, is the key element of the wife's need for support, a need to be measured in light of her own income and assets and the standard of living to which she had become accustomed. In *Donigan v. Donigan*, 208 Md. 511, 519, it was noted in assessing the wife's need for support: "What is insufficient for A under one set of circumstances may be sufficient for B under another set of circumstances. What might be luxury for one woman could be poverty for another." We think the award of alimony should secure to the wife the same social standing, comforts, and luxuries of life as she would probably have enjoyed had it not been for the enforced separation. See 24 Am.Jur.2d *Divorce and Separation,* Section 635. That the wife's negligible income, together with her substantial interest in the jointly owned properties and the income produced thereby, would not without more supply that status is wholly apparent. Considering the controlling factors of the husband's financial ability and the wife's need for support in accordance with her station in life, as shown by the record, along with the other determinative factors set forth in *Waters v. Waters, supra,* we think the Chancellor's judgment in awarding alimony of $4,000 monthly was clearly wrong. We think a proper alimony award in this case would be $2,250.00 monthly. In so concluding, we have considered the living expenses claimed by the wife at trial, as well as those claimed by her prior to trial and actually made, together with the income tax consequences of each, both on the husband and the wife. We have considered the likelihood that the wife will not be able to work and that her health is not particularly good. We have considered the wife's contribution to the fault which destroyed the marriage, a contribution which we, like the Chancellor, view as minimal in comparison to that of the husband. We have considered the fact that the wife

materially contributed to her husband's success in business, and that they lived together some twenty-eight years. And we have considered the husband's age, physical condition, and ability to work at the time of trial.[8] Of course, should the circumstances, needs, and financial conditions of the parties change, the court retains jurisdiction to amend its decree accordingly. *Willoughby v. Willoughby, supra.*

### The Counsel Fee

The $15,000 counsel fee was based upon 297 hours spent by the wife's attorney on the case; broken down, it amounted to approximately $50.00 per hour.

Counsel fees should be awarded according to the ordinary factors of labor, skill, time, and benefit; and the amount of the fee cannot be wholly disassociated from the financial resources of the party charged. *Waters v. Waters, supra.* As stated in *Lopez v. Lopez,* 260 Md. 509, 520-521, in determining the amount of the counsel fee to be paid by the husband to the wife's solicitor, "the court should take into consideration the financial circumstances of the parties, and determine the amount in accordance with the wife's necessities and the husband's financial ability, and allow an amount that will afford the wife an efficient presentation of her side of the controversy."

The husband claims, without intending to demean the skill and worth of the wife's counsel, that the $50.00 hourly rate was grossly excessive. The wife, on the other hand, points out that the husband is a man of unusual wealth; that the litigation was successfully terminated in her favor; that the case was an extremely complicated and time consuming one requiring great effort; and that she has no separate estate.

Our consideration of the relevant criteria compels the conclusion that the award was larger than it should have been and that a fee of $10,000 would be entirely adequate in the circumstances of this case. Of course, the wife is

---

8. The husband suffered two heart attacks some years prior to trial.

not precluded from supplementing that fee. *See Schuman v. Schuman, supra.*

We find no reversible error in the circumstances of this case, as claimed by the husband, by reason of the Chancellor's failure to render his decision within two months after the trial was concluded. While both Article IV, Section 23 of the Maryland Constitution, and Maryland Rule 18b were violated by the Chancellor's failure to render his decision within that period of time, these provisions are directory only, and not mandatory. *See Pressley v. Warden,* 242 Md. 405.

Finally, we have considered but find no merit in and, therefore, deny the wife's motion to dismiss the husband's appeal on the ground (1) that the husband failed to comply with Maryland Rule 1031 c 3, and (2) that as the husband had accepted certain of the benefits conferred by the decree, he either waived his right to appeal or is estopped from doing so.

> *Decree modified by reducing the award of alimony from $4,000 per month to $2,250 per month, and by reducing the award of counsel fees from $15,000 to $10,000. As modified, decree affirmed; costs to be paid by appellant.*