802 A.2d 1106

**Din M. KARMAND**

v.

**Soraya KARMAND.**

**No. 518 Sept. Term, 2001.**

Court of Special Appeals of Maryland.

July 2, 2002.

Jeffrey N. Greenblatt (Brodsky, Greenblatt & Ronehan, Chartered, on the brief), Gaithersburg, for appellant.

Cynthia Callahan (Vincent M. Wills, on the brief), Rockville, for appellee.

Argued before DAVIS, DEBORAH S. EYLER, and GREENE, JJ.

DEBORAH S. EYLER, Judge.

Din M. Karmand, the appellant, challenges the judgment of the Circuit Court for Montgomery County (Sundt, J.) in his divorce action against Soraya Karmand, D.D.S., the appellee. The appellant presents the following questions for review, which we have combined and rephrased as follows:

I. Did the trial court abuse its discretion in denying his request for indefinite alimony?

II. Did the trial court err in permitting the appellee to testify about the value of her dental practice?

III. Did the trial court err by not ascertaining what portion of the value of the marital home was derived from the appellant's non-marital property?

IV. Did the trial court err by classifying as extant marital property a Jeep the appellant gave to his daughter in January 2000, and $3,823 in cash he put in a joint account with his daughter in August 1999?

V. Did the trial court err in valuing certain jewelry based on the appellee's testimony about what she paid for it?

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

The following evidence was adduced at trial, which took place in February 2001.

The appellant was born in Afghanistan. In 1968, he emigrated to the United States; and he became an American citizen thereafter. The appellant attended graduate school at the University of Maryland, earning a masters degree in

mechanical engineering in 1972. At the time of trial, he was 56 years old and had been employed for slightly more than 18 years as a property engineer for the Floyd Davis Company.

The appellee was born in Iran, and completed two years of college in that country. In 1977, she emigrated to the United States. She also eventually became an American citizen. At the time of trial, the appellee was 49 years old and was working full time in her own private dental practice.

The parties married on April 12, 1980. They moved into a house in Silver Spring that the appellant owned, and had purchased prior to the marriage. The house subsequently was retitled to tenants by the entireties ownership.

The parties' first child, a girl named Arezo, was born on August 2, 1981.

When the parties married, the appellant was working full-time for Blake Construction Company and part-time for the Crown Corporation. Soon after the marriage, the appellee enrolled in Montgomery College. While attending school, she worked part-time during the school year, and full-time during the summer, as a chairside dental assistant, at the Georgetown Dental School.

The appellee earned her associates degree and then continued with her schooling at Montgomery College. She attended school part-time and worked part-time in a private dental office.

In 1985, the parties had a second child, a boy named Omied. The appellee was the primary care-giver for the parties' children. She continued with her education, however, and in 1986 earned a bachelors degree from Montgomery College.

After Omied was born, the parties sold their house in Silver Spring and purchased a house in Potomac.

Soon after she earned her bachelors degree, the appellee was admitted to Howard University Dental School. She attended that dental school full time, from 1986 to 1990. During those four years, the appellee did not work outside the home. The appellant supported the family by working two full-time

jobs. For five days a week, he worked eight hours during the day for the Floyd Davis Company and eight hours during the night for the Crown Corporation. He employed a nanny to help with the children. The appellee remained the primary care-giver for the children and took care of the house.

The appellee took out student loans to finance her dental school education. In July 1990, soon after she graduated from dental school, the appellant paid $8,000 toward the balance on the appellee's student loans.

Immediately upon graduation, the appellee opened a private dental practice in a rented office on Colesville Road, in Silver Spring. Because the space had never been used for a dental office, it needed extensive remodeling. The appellant oversaw the construction, supervising the electricians, plumbers, carpenters, and painters. The appellee worked with the architect and obtained the necessary permits for the construction. The initial cost of construction was about $129,000. The parties paid this sum with $64,000 from their joint savings accounts and $65,000 obtained by refinancing their house in Potomac.

In the early years of her dental practice, the appellee worked seven days a week, twelve hours a day. She also was responsible for the children and for taking care of the house. With time, her practice became established and profitable. She was able to use her earnings from the practice to pay off her student loans.

In October 1994, the parties decided to purchase the Colesville Road property that housed the appellee's dental practice. The purchase price was $188,000. The parties purchased the property free and clear by again refinancing their Potomac house.

Also in 1994, the appellee returned to dental school and obtained a specialized degree in orthodontics. Her tuition was paid with marital funds.

During the marriage, the appellant was responsible for the family's financial investments. He purchased, in joint names, two rental properties in Virginia, and handled all the business

aspects of the properties, such as collecting rent and property maintenance. As the appellee's practice became more lucrative, the appellant invested the earnings it produced. The investments included establishing custodial accounts for the children, which by the time of trial had balances totaling $210,000.

In 1994, the appellant was diagnosed with diabetes. He underwent angioplasties in 1997 and 1999, and in 2000 was diagnosed with high blood pressure. As of the time of trial, he was taking several medications.

In 1999, the parties' relationship became strained. There was some evidence that the appellant had become involved in a relationship with another woman, although he denied that. There also was evidence that the appellee had become estranged from the appellant and had told a mutual friend that she did not love him anymore. The deterioration in the parties' relationship continued and culminated in their voluntarily separating on September 6, 1999.

On September 10, 1999, the appellant filed a complaint for limited divorce, in the Circuit Court for Montgomery County. He later filed an amended complaint for absolute divorce. The appellee answered and filed a counter-complaint for absolute divorce.

On March 22, 2000, the parties entered into a consent order on the issues of custody, visitation, and child support with respect to Omied. (By then, Arezo was emancipated by age). The agreement gave the parties joint legal custody, with the appellee having primary residential custody and the appellant having visitation. The appellant agreed to maintain health insurance for Omied and to pay $451 per month in child support.

The case went to trial on the issues of grounds for divorce, use and possession of the marital home, alimony, monetary award, and attorney's fees. The trial lasted three days. On March 29, 2001, the court entered a judgment of absolute divorce, on the ground of mutual and voluntary separation.

On April 11, 2001, the court issued a memorandum opinion and order awarding the appellee use and possession of the family home until July 13, 2003 (Omied's eighteenth birthday), denying the appellant's request for indefinite alimony, directing that the parties' marital property be sold and divided by title, and reserving on the issue of attorney's fees.

The appellant noted this appeal on May 10, 2001.[1]

We shall recite additional facts as pertinent to our discussion of the issues.

## DISCUSSION

### I

The appellant first challenges the trial court's decision denying his request for indefinite alimony. As the Court of Appeals explained in *Tracey v. Tracey*, 328 Md. 380, 614 A.2d 590 (1992), we review that decision under an abuse of discretion standard:

An alimony award will not be disturbed on appellate review unless the trial judge's discretion was arbitrarily used or the judgment below was clearly wrong. This standard implies that appellate courts will accord great deference to the findings and judgments of trial judges, sitting in their equitable capacity, when conducting divorce proceedings.

*Id.* at 385, 614 A.2d 590 (citations omitted).

The appellant maintains that Judge Sundt's decision to deny his request for indefinite alimony was based on two clearly erroneous factual findings, and therefore was an abuse of discretion. The findings he takes issue with are: 1) that he is self-supporting, and 2) that the standards of living of the parties are not "unconscionably disparate."

Historically, alimony was judicially defined as court ordered payments made by a husband to a wife for her support for their joint lives, so long as they lived separate and apart and

---

1. The appellee requested a hearing on the issue of attorney's fees. The trial court postponed holding such a hearing pending this appeal.

the wife did not remarry. *Mendelson v. Mendelson,* 75 Md. App. 486, 495, 541 A.2d 1331 (1988). Thus, by tradition, the primary purpose of alimony was to enable a financially dependent wife to continue her standard of living after separation or divorce. *Quinn v. Quinn,* 11 Md.App. 638, 651, 276 A.2d 425 (1971). "It was a basic concept of alimony that a financially dependent [wife] (at least one who was not at fault for the destruction of the marriage) should be able to maintain the same standard of living to which [she] had become accustomed during the marriage, provided, of course, that [the husband] could afford it." *Holston v. Holston,* 58 Md.App. 308, 321, 473 A.2d 459 (1984). When Maryland adopted the Equal Rights Amendment in 1972, Article 46, Md. Decl. Rights, courts became empowered to award alimony to husbands as well as to wives. *Quigley v. Quigley,* 54 Md.App. 45, 52, 456 A.2d 1305 (1983).

The essential purpose of alimony was changed with the adoption of the Maryland Alimony Act in 1980 ("Act"). Where the principal function of alimony once had been maintenance of the recipient, dependent spouse's standard of living, upon passage of the Act, that function became rehabilitation of the economically dependent spouse. Since passage of the Act, " 'the purpose of alimony [has been] to provide an economic means for both parties to deal with their new unmarried life on their own. Put another way, the purpose of alimony is to provide an opportunity for the recipient party to become self-supporting.' " *Turrisi v. Sanzaro,* 308 Md. 515, 524, 520 A.2d 1080 (1987) (quoting 1980 *Report of the Governor's Commission on Domestic Relations Laws* (hereinafter "Governor's Commission's Report"), at 2).

Under the Act, alimony no longer serves the purpose of providing a lifetime pension to an economically dependent spouse. *Turrisi v. Sanzaro, supra,* 308 Md. at 524–25, 520 A.2d 1080; *Jensen v. Jensen,* 103 Md.App. 678, 692, 654 A.2d 914 (1995); *Holston v. Holston, supra,* 58 Md.App. at 321, 473 A.2d 459. *See also* Governor's Commission's Report, at 4. Rather, its primary purpose is to aid an economically depen-

dent spouse in becoming independent through self-sufficiency, when practicable. As noted in the Governor's Commission's Report: "The award of alimony in the ordinary case should be for a specific time, and that time should be stated in the Order or Decree making the award. Preferably, that time should be fixed in relation to a specified program or goal on the part of the recipient party that will lead to self-sufficiency before that time." Governor's Commission's Report, at 4.

It is now well recognized that the sole purpose of temporary alimony is rehabilitation of the recipient spouse and, for that reason, an award of temporary alimony must be grounded in a finding that the recipient spouse is not self-supporting and needs training, education, or other steps to help that spouse achieve financial self-reliance. *Reuter v. Reuter*, 102 Md.App. 212, 229, 649 A.2d 24 (1994). *See also Lemley v. Lemley*, 102 Md.App. 266, 300, 649 A.2d 1119 (1994)(holding that an award of temporary or rehabilitative alimony may not be made unless the recipient spouse is not self-supporting and citing *Hull v. Hull*, 83 Md.App. 218, 220–221, 574 A.2d 20 (1990)). In keeping with the recommendations of the Governor's Commission's Report, the law favors temporary alimony awarded for a definite time period to facilitate the transition from the married to single state and rehabilitation of the dependent spouse to self-sufficiency. *Turrisi v. Sanzaro, supra*, 308 Md. at 524–25, 520 A.2d 1080.

The Governor's Commission's Report recognized two exceptions to the guiding principle that alimony be temporary and rehabilitative, and recommended that trial judges be given wide discretion to resolve those exceptional instances on a case-by-case basis. The exceptions are addressed in Md.Code (1999 Repl.Vol., 2000 Supp.), section 11–106(c) of the Family Law Article ("FL"). Under the first exception, the court may award indefinite alimony if, "due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting." FL § 11–106(c)(1). Under the second excep-

tion, the court may award indefinite alimony upon a finding that

> even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.

FL § 11–106(c)(2).

With regard to the issue of the respective standards of living of former spouses after divorce, the Governor's Commission's Report observed:

> The measure of self-sufficiency for a divorced party has been less widely discussed than the question of the period of time during which alimony should be paid. Nevertheless, underlying the views expressed to the Commission by individuals and organizations, there is discernible a range of disagreement, bounded on the one hand with the view that any standard is acceptable that holds body and soul together, and on the other by the position that the recipient spouse must live on the same scale as the paying one, indeed on the same scale as that on which the parties lived while married.

> The Commission believes that different ills call for different remedies. Certainly Cinderella, after only a week of marriage, even to the Prince, might be young and strong enough to adapt herself to a return to her stepmother's kitchen. Cinderella, after thirty years of royal marriage, would find such a return a less practicable course.

> The Commission believes that the proper solution is neither to forbid nor to require either equality or discrepancy with respect to the standard of living of the parties after a divorce. Our proposal does not require the Court to make the two standards the same. It does empower the Court, however, in cases where the standard of living of the recipient party would be *unconscionably* disparate from that of the paying party, to provide for an extended or indefinite period of payment. This allows the matter of

relative standards of living to be resolved, as it seems to us it must be, on a case-by-case basis.

Governor's Commission's Report, at 4–5. (Emphasis in original.)

In *Roginsky v. Blake–Roginsky,* 129 Md.App. 132, 142, 740 A.2d 125 (1999), *cert. denied,* 358 Md. 164, 747 A.2d 645 (2000), we explained that because the objective of alimony is to assist spouses in becoming self-supporting and not to provide a lifetime pension, indefinite alimony should be awarded "only in exceptional circumstances." *See also Turrisi v. Sanzaro,* 308 Md. at 527, 520 A.2d 1080 (observing that the concepts underlying the Act, including "the use of indefinite alimony only in exceptional circumstances," did not mandate elimination of the power to reserve). In addition, "[a] trial court's finding of unconscionable disparity under [FL section 11–106(c)(2)] is a question of fact, and [the appellate court will] review it under the clearly erroneous standard contained in Md. Rule 8–131(c)." *Roginsky v. Blake–Roginsky,* 129 Md. App. at 143, 740 A.2d 125.

FL section 11–106(b) addresses considerations that must be made by the court in determining the amount and duration of any alimony award. It provides that "the court shall consider all the factors necessary for a fair and equitable award," including the specific factors listed thereafter. When a party seeks indefinite alimony under FL section 11–106(c)(2), the court must consider the factors enumerated in subsection (b), to the extent pertinent, in deciding whether there is a disparity in the parties' respective standards of living and, if so, whether the, disparity is "unconscionable." As the prefatory language in subsection (b) makes plain, however, the court is not restricted to a consideration of the factors expressly listed.

In the case at bar, Judge Sundt's memorandum opinion addressed each of the factors in FL section 11–106(b). She made the following factual findings, which are fully supported by the record.

As of the time of trial, the appellant was employed full time, earning a gross income of $67,000 a year. He did not need

further education or training to continue in his employment. During the three years preceding the trial, the appellee's dental practice had earned between approximately $250,000 and $350,000 annually. In some years, those earnings had included earnings produced by another dentist with whom the appellee was working. On the appellee's financial statement, which was introduced into evidence, she listed her monthly income as $15,470 (which converts to an annual income of $185,640); her monthly expenses as $6,063 per month; and Omied's monthly expenses as $3,858 per month. None of the expenses is unreasonable; the highest expenses are for the monthly mortgage and legal fees.

Because the parties jointly own the Silver Spring office building in which the appellees' dental practice is located, when all of the parties' jointly owned real estate is sold, the appellee will have to move her office to a new location. The court found that the appellee may suffer a decline in income when that occurs, and may incur additional expenses in order to relocate. The court concluded that for these reasons, "it is unlikely that [the appellee's] gross receipts will reflect the success of prior years, at least temporarily."

At the time of trial, the appellant was living in a condominium owned by the parties' daughter, but paid for by him.

In the last several years before the parties separated, the appellee was the primary source of financial support for the family. The parties enjoyed an affluent standard of living during their marriage. They owned four pieces of real property, five cars, and valuable jewelry. They traveled extensively, including trips to Turkey, London, and Spain. The appellant's investment acumen resulted in the parties' earning income above and beyond their salaries through employment.

Both parties made monetary and non-monetary contributions to the well-being of the family. The appellant supported the family financially, by working two full-time jobs when the appellee was attending dental school and hiring a nanny for the family. He assisted with the building renovations for the

appellee's dental practice, and helped the appellee establish and expand her practice.

Before becoming the primary source of financial support for the family in the latter years of the marriage, and while she was attending school and working part time, the appellee was the primary custodial parent for the children, especially when they were very young.

The parties' marriage deteriorated over a long period of time, with episodes of ugly conflict in the summer of 1999 that led to the parties' separation. Much of the conflict concerned the appellant's controlling attitude toward the appellee, including his insistence on deciding how the earnings from her dental practice would be invested, to the exclusion of recommendations made by the parties' accountant. Judge Sundt commented that since the parties' separation, the appellant had fostered a controlling relationship with Arezo that seemed to encourage her alienating herself from her mother. Judge Sundt concluded, however, that the breakup of the marriage was a consequence of the parties' having gradually grown apart.

As of the time of trial, the parties' real estate, all jointly owned, had a value of $917,420. The court ordered that that property be sold. (The court granted the appellee use and possession of the marital home, so that asset will not be sold until after July 13, 2003.) Upon the sale of all the parties' real property, each party will receive approximately $458,000. The total value of the parties' marital personal property was $303,792. Of that amount, $157,427 was titled in the appellee's name, and $146,365 was titled in the appellant's name.

As noted above, the appellant disagrees with the following factual findings made by Judge Sundt.

Judge Sundt found that the appellant is self-supporting. Specifically, she rejected his contention that he is in poor health and that his health affects his ability to work. Judge Sundt commented that the appellant was working full-time and apparently intends to continue to do so.

Second, Judge Sundt found that the parties' standards of living are not "unconscionably disparate." In so finding, she explained:

> In plain English, unconscionability means, "morally unacceptable ... shocking." Fader, J. & Richard Gilbert, *Maryland Family Law*, § 5.66 (3d. ed.2000). Case law reflects that the party seeking alimony because of "unconscionable disparity" has the burdens of persuasion and production. Essentially, "unconscionable economic disparity is more than a numerical calculation." *Innerbichler v. Innerbichler*, 132 Md.App. 207[, 248, 752 A.2d 291] (2000). Furthermore, "[a] finding of mathematical disparity will not automatically trigger an award of indefinite alimony." *Ware v. Ware*, 131 Md.App. 207, 232, 748 A.2d 1031 (2000). The Court must apply equitable considerations on a case-by-case basis aided by several factors. The standard of living of the parties must be considered as well as how and when that standard was acquired. Additionally, the assets of the parties and whether a monetary award was given impact the decision awarding alimony.

(Citing Fader, J. and Gilbert, R., *Maryland Family Law*, § 5.10, 5–66 (3d. ed.2000).)

After completing her discussion of the factors listed in FL section 11–106(b), Judge Sundt went on to find that given that the appellant earns $67,000 per year, has assets titled in his name and in his control of $142,842, and will be receiving approximately $458,000 upon the sale of the parties' real property, and that while the appellee's dental practice is successful, it likely will experience a temporary decline in revenue after the divorce, "[t]here is no need or basis for awarding alimony," and any disparity in the parties' standards of living is not unconscionable.

The appellant's challenge to Judge Sundt's finding that he is self-supporting is two-fold. He takes issue with the court's conclusion that he is not in poor health, arguing that the evidence was uncontradicted that he had undergone two angioplasties, was suffering from hypertension and diabetes, and

was taking numerous medications. This challenge has no merit. Plainly, Judge Sundt accepted the uncontradicted evidence about the state of the appellant's health but found, contrary to his assertion, that the state of his health was not interfering with his ability to work. The court's finding on this point was supported by the evidence, which showed that the appellant indeed was physically capable of working full-time in his field of mechanical engineering.

The appellant also argues that his financial statement, which was introduced into evidence, and was not contradicted by any other evidence, showed that he was not self-supporting because his monthly income of $4,300 is less than his monthly expenses of $6,600.

In fact, the figures the appellant recites are not as they are reflected on his financial statement. The financial statement shows that his gross monthly salary is $5,285.41, with another $333.33 in bonuses; his approximate net monthly salary after taxes is $4,101.97. His approximate monthly expenses, including such incidentals as $150 for vacations, $150 for donations to charities, $90 for gifts, and $70 for entertaining at home, and not including voluntary contributions to a retirement fund, total $4,961. Those expenses include $451 in child support (which will terminate in slightly more than a year), and $1,500 rental for the condominium in which the appellant lives; he testified, however, that the condominium rental in fact is $500 a month, but he has been paying his daughter $1,000 per month above that amount.

The evidence about the appellant's monthly income and expenses supports Judge Sundt's finding that he is self-supporting. We hasten to add, moreover, that a person does not establish that he is not self-supporting merely by presenting monthly expenses, even reasonable monthly expenses, that exceed his monthly income. If that were the test, a multimillionaire could be found not to be self-supporting.

The appellant asserts that Judge Sundt's finding that the parties' standards of living are not "unconscionably disparate" ignores uncontradicted evidence about a great disparity in the

parties' incomes and in the affluence *vel non* of their lifestyles. He points out that since the separation, the appellee has purchased a luxury automobile, has continued to take expensive vacations to foreign countries, and enjoys earnings of at least three times his earnings. By contrast, he drives an old automobile purchased during the marriage, has not taken any vacations, lives with his daughter, and earns about a third of what the appellee earns.

The appellant argues that Judge Sundt's focus on the value of the assets he will own after the parties' real property is sold in deciding the issue of unconscionable disparity was misplaced, because the appellee will receive an equal amount of those assets. Thus, she will be able to hold on to those assets, fund her affluent lifestyle with current earnings, and save for retirement. He, on the other hand, will have to liquidate the assets he receives in the divorce to experience any aspect of the affluent lifestyle he once enjoyed, and because his earnings are much lower than the appellee's, he also will have to liquidate some of those assets to fund his retirement. The appellant maintains that this is unfair given the extreme sacrifice he made to enable the appellee to attend dental school and obtain the degree that has resulted in her earning a hefty income.

The appellant emphasizes the difference in his income and that of the appellee, and cites numerous cases in which courts have awarded indefinite alimony when the ratios of the parties' incomes have been similar to what the ratio is here. *See e.g., Tracey v. Tracey,* 328 Md. 380, 392–93, 614 A.2d 590 (1992) (wife's potential income was 28% of the husband's projected income); *Ware v. Ware,* 131 Md.App. 207, 230, 748 A.2d 1031 (2000) (affirming award of indefinite alimony where wife's projected income was 25.3% of the projected income of her husband); *Digges v. Digges,* 126 Md.App. 361, 388, 730 A.2d 202 (1999) (wife's projected income was 30% of the husband's projected income); *Caldwell v. Caldwell,* 103 Md. App. 452, 464, 653 A.2d 994 (1995) (wife's projected income was 43% of that of her husband); *Blaine v. Blaine,* 97 Md.App. 689, 708, 632 A.2d 191 (1993), *aff'd,* 336 Md. 49, 646

A.2d 413 (1994) (wife earned 22.7% of husband's income); *Broseus v. Broseus,* 82 Md.App. 183, 196–97, 570 A.2d 874 (1990) (wife earned 34.9% of husband's income); *Bricker v. Bricker,* 78 Md.App. 570, 576–77, 554 A.2d 444 (1989) (wife's income was 35% of her husband's income); *Kennedy v. Kennedy,* 55 Md.App. 299, 307, 462 A.2d 1208 (1983) (wife earned 34% of husband's annual income). We do not find the appellant's arguments persuasive. The evidence supports Judge Sundt's finding that the parties' respective standards of living are not unconscionably disparate; accordingly, she did not abuse her discretion in declining to award the appellant indefinite alimony.

A mere *difference* in earnings of spouses, even if it is substantial, and even if earnings are the primary means of assessing the parties' post-divorce living standards, does not automatically establish an "unconscionable disparity" in standards of living. To constitute a "disparity," the standards of living must be fundamentally and entirely dissimilar. Moreover, as the statute makes clear, before such a disparity in standards of living will permit an award of indefinite alimony, it must be "unconscionable."

It bears repeating that unlike in the early and middle years of the twentieth century, alimony is no longer a vehicle for long-term support for once economically dependent spouses (and as we have pointed out, until 1972, only for wives). Then, because of the generally inferior economic status of women in society, alimony often was the only means of support for divorced and separated wives who both during and after their marriages had little opportunity for gainful employment.

Today, a quarter of a century after the women's liberation movement of the late 1960's effected a cultural sea change, opening doors for women to enter careers formerly unavailable to them, and two decades after enactment of the Maryland Alimony Act, the notion that in most marriages spouses occupy preordained roles of breadwinner and dependent is an anachronism. In some marriages, the husband and wife agree to occupy those roles, for a myriad of reasons personal to

them. That is a choice, however, not a limitation imposed by law. In many marriages, the spouses both are breadwinners, or may alternate in the roles of breadwinner and dependent. Unlike in times past, however, there are opportunities in the workplace and the professions for both genders, and in this country spouses are not culturally pre-destined to occupy given economic roles in a marriage.

The evidence in this case showed that in the marriage of the parties, no one spouse occupied the role of breadwinner, and no one spouse was economically dependent. At different times in the marriage, one party was in the economic ascendancy, and the other party contributed in non-economic ways to the well-being of the other spouse, the children, the marriage, and the family unit. The parties changed roles as their circumstances changed.

The appellant is correct that his exceptional work ethic allowed his family to enjoy a comfortable living while the appellee attended dental school. At the same time, however, the appellee contributed to the well-being of the children, by being their primary care-giver. When she attained professional success, her substantial income not only produced the affluent lifestyle in which the appellant shared but also produced substantial marital assets. The evidence showed that the appellee's earnings over and above what was necessary to sustain her dental practice and pay the bills resulted in the accumulation of joint wealth in which the appellant is sharing post-divorce.

The contributions the appellant made to enable the appellee to obtain her dental degree and create a successful dental practice, while important to the welfare of the family during the marriage, simply do not translate after divorce into an income-generating investment in the appellee. This is what is meant by those cases that have held that alimony is no longer a means for obtaining a lifetime pension. *Turrisi v. Sanzaro, supra,* 308 Md. at 524–25, 520 A.2d 1080; *Jensen v. Jensen, supra,* 103 Md.App. at 692, 654 A.2d 914; *Holston v. Holston, supra,* 58 Md.App. at 321, 473 A.2d 459. *See also* Governor's

Commission's Report, at 4. Moreover, the appellee's dental practice is itself an item of marital property that was valued by the court and considered in its equitable distribution of that property.

Finally, the appellant argues that the evidence showed that the parties had entered into an agreement whereby the appellee would continue as the primary breadwinner and the appellant would retire and work part-time to manage the appellee's dental practice. The evidence was disputed on this issue, however, and Judge Sundt clearly did not accept the appellant's testimony that the parties had such an agreement.

In circumstances such as those in this case, when both spouses either are self-supporting or are capable of becoming self-supporting, indefinite alimony is warranted if the standard of living of one spouse will be so inferior, qualitatively or quantitatively, to the standard of living of the other as to be morally unacceptable and shocking to the court. Whether the post-divorce standards of living of former spouses are unconscionably disparate only can be determined by a fact-intensive case-by-case analysis. *Tracey v. Tracey,* 328 Md. at 393, 614 A.2d 590 (observing that alimony awards "are founded on notions of equity" and "equity requires sensitivity to the merits of each individual case without the imposition of bright-line tests").

Judge Sundt engaged in a thorough factual and legal analysis of the evidence and found that the parties' standards of living were not disparate and any disparity that might exist was not morally unacceptable and shocking, given the parties' economic history. The parties have not taken issue with the standard articulated by Judge Sundt in assessing whether an "unconscionable disparity" exists: that the disparity in the parties' respective standards of living is morally unacceptable and shocking. *See* Fader and Gilbert, *Maryland Family Law, supra,* section 5.10, at 5–66. *See also Black's Law Dictionary* (Seventh ed.) (defining "unconscionable" to include "affronting the sense of justice, decency"); Fader, J. and Gilbert, R., *Maryland Family Law, supra,* at 5–66 (including

as a second definition of "unconscionable," "unreasonable far beyond what is considered reasonable"). *Cf. Williams v. Williams,* 306 Md. 332, 333, 508 A.2d 985 (1986) (affirming trial court's decision setting aside a separation agreement upon a finding that it was unconscionable because it "was so oppressive on the husband that it shocked the conscience of the [trial] court"). Based on the facts in evidence, Judge Sundt concluded that there was not an "unconscionable disparity" in the parties' standards of living so as to warrant an award of indefinite alimony. We will not fault Judge Sundt's findings or her exercise of discretion, based on those findings, to deny the appellant's request.

## II

The appellant contends that the trial court erred in allowing the appellee to testify about the value of her dental practice.

This issue was not preserved for review. The record reveals that the appellant's trial counsel did not object when the question that elicited the testimony at issue was posed (or at any point during the examination on the issue.) We will not review a challenge to the admissibility of evidence that was neither raised nor decided by the court below. Md. Rule 8–131(a).

## III

The appellant next contends that the trial court erred in making its decision about whether to grant a monetary award. Specifically, he argues that the court's finding that he did not contribute any non-marital funds to the acquisition of the parties' Potomac house, which was acquired during the marriage and was held by the parties as tenants by the entireties, was clearly erroneous, and was relied upon by the court when it evaluated the factors relevant to whether to grant a monetary award under FL section 8–205.

In Judge Sundt's written opinion, she engaged in the required three-step analysis applicable to the equitable distribu-

tion of marital property (identifying which property is marital, valuing that property, and deciding whether to make a monetary award to adjust the rights and equities of the parties. *See Holston v. Holston, supra,* 58 Md.App. at 318, 473 A.2d 459). Judge Sundt properly determined that the parties' Potomac house was marital property. Under FL section 8–201(e)(2), "marital property" includes any interest in real property held by the parties as tenants by the entireties unless it is excluded by valid agreement. There was no assertion by either party that any such agreement existed. Indeed, the issue whether the Potomac house was marital property was not contested; on their joint asset statement, filed pursuant to Md. Rule 9–206, the parties classified the Potomac house as marital property not in dispute.

The appellant maintains that he testified that the purchase of the Potomac house by the parties in 1985 was funded, in part, with the proceeds of the sale of their house in Silver Spring, which he purchased before the marriage, and with $26,500 in proceeds he received in 1985, upon the sale of 2.7 acres of raw land in Virginia, which he also purchased before the marriage. He complains that Judge Sundt properly should have found that he contributed non-marital funds to the purchase of the Potomac house, and should have taken that into account in deciding whether to grant him a monetary award. Instead, she incorrectly took into account that he did not contribute any non-marital funds to the purchase of the Potomac house.

Contrary to his assertions, the appellant did not testify that he contributed non-marital funds from the proceeds of the sale of the Silver Spring house to the purchase of the Potomac house. The appellant testified that he owned the Silver Spring house before the parties were married; that after the marriage, the house was retitled in both the parties' names; and that they sold the Silver Spring house before the parties purchased the Potomac house. He did not testify that any proceeds were realized from the sale of the Silver Spring house; if so, the amount of the proceeds; and whether any such proceeds were paid toward the purchase of the Potomac

house. In short, the evidence was lacking from which Judge Sundt or any reasonable fact-finder could have found that the appellant · contributed non-marital proceeds from the sale of the Silver Spring house to the purchase of the Potomac house.

The appellant correctly asserts that notwithstanding his testimony that he applied the $26,500 in proceeds from the sale of his pre-maritally purchased Virginia property to the purchase of the parties' Potomac house, Judge Sundt found that he did not contribute non-marital assets to the purchase of the Potomac house. Even assuming that Judge Sundt's factual finding that neither party contributed non-marital funds to the purchase of the Potomac house was in error, we conclude that the appellant waived his right to raise this issue on appeal, and the error was not prejudicial in any event.

As noted above, under FL section 8–201(e)(2), the parties' Potomac house was entirely marital property, irrespective of whether non-marital funds were applied to its purchase (so long as it was not excluded by valid agreement, which it was not). FL section 8–201(e)(3), which provides, *inter alia,* that property is not "marital property" when it was acquired before the marriage, acquired by inheritance or gift from a third party, or is directly traceable to any of these sources, does not apply to paragraph 2 of the subsection. Thus, the source of funds theory does not apply to an interest in real property held by the parties as tenants by the entireties. Accordingly, the fact that the appellant used non-marital funds in the purchase of the parties' Potomac house could not mean that a portion of that property was non-marital.

The only positive impact for the appellant that the evidence concerning the application of the proceeds of the sale of the Virginia property to the purchase of the Potomac house could have produced was in respect to the third step of the three-step process we outlined above. Under FL section 8–205, one of the factors to be considered by the trial court in deciding whether to grant a monetary award is the contribution by either party of non-marital property, as described in FL section 8–201(e)(3), to the acquisition of real property held by

the parties as tenants by the entireties. Thus, Judge Sundt could have factored the appellant's contribution into her decision about a monetary award.

Yet, the appellant did not ask Judge Sundt to grant him a monetary award. The only mention ever made by him of a request for a monetary award appears in his amended complaint for absolute divorce, filed on January 22, 2001, in which he listed, among the eleven items of relief requested, a monetary award. At trial, the appellant made no argument whatsoever to the court for a monetary award. Indeed, on the contrary, the appellant's trial counsel asked the court to order the sale of all of the parties' marital property with division by title, a request that was inconsistent with his seeking a monetary award.

Having failed to ask the trial court for a monetary award, the appellant cannot now take the position that the court erred by not considering in its analysis of whether to grant him a monetary award the fact that he contributed non-marital funds to the purchase of the Potomac house. The appellant waived this issue by not asking the trial court for a monetary award.

Moreover, any error by the trial court in this respect was harmless. The error could not have affected the court's consideration of his request for a monetary award because he made no such request. The trial court engaged in the three-step analysis of whether to grant a monetary award because the *appellee* asked for a monetary award. Potentially, evidence that the appellant had contributed non-marital funds to the purchase of the Potomac house could have weighed against the equities of granting the appellee a monetary award. The court *denied* the appellee's request for a monetary award, however. Thus, any error on the part of the court in not considering the appellant's contribution of the proceeds of the sale of his Virginia property to the purchase of the marital home did not affect the outcome of its decision whether to grant the appellee a monetary award, and therefore did not prejudice the appellant.

## IV

The appellant next contends that the trial court erred by including as extant marital property a Jeep he gave Arezo in January 2000, after the parties separated, and $3,823 in cash he deposited in a joint account ("the Sequoia account") with Arezo in August 1999, before the parties separated. The appellant concedes that these items were marital property; he argues, however, that the trial court erred in finding that he dissipated them, and in including them as extant marital property on that basis.

Judge Sundt's ruling on the dissipation issue was as follows:

In *Jeffcoat v. Jeffcoat,* 102 Md.App. 301, 649 A.2d 1137 (1994), the Court held that a finding of fraud was not necessary to determine a dissipation of marital assets. Rather, the burden of production and initial burden of persuasion is on the party making the dissipation claim. However, if the moving party makes a prima facie case, the accused party must justify the expenditures. The court must determine whether marital assets have been spent or otherwise disposed of for other than family purposes with the intention of reducing the amount of property available to the court for equitable distribution. . . . .

*1994 Jeep Grand Cherokee:* [The appellant] listed the Jeep as nonmarital property and points to the title being in his daughter Arezo's name as proof of the nature of the property. [The appellee] lists the Jeep as marital property.

[The appellant] testified that he gave the Jeep to his daughter as a gift, thereby excluding it from the martial property category. According to his testimony, he transferred the title to Arezo in January 2000. She now uses the Jeep to commute to the University of Maryland. Prior to January 2000, the Jeep was titled in [the appellant's] name. However, there is no question that marital funds were used to purchase the Jeep; therefore, it was marital property at the time [the appellant] unilaterally decided to give it away. The effect of his "gift" is to reduce the property available to the [c]ourt for equitable distribution. The [c]ourt cannot

transfer title to property, but its value can and will be included among [the appellant's] assets for purposes of a monetary award determination.

\* \* \* \* \*

*The Sequoia Account:* [The appellant] lists the Sequoia account shared with his daughter as nonmarital. [The appellee] lists the property as marital. The account was opened in August 1999. At the hearing, [the appellant] testifie[d] that he deposited his paycheck in the account as a "gift." As with the Jeep, [the appellant] gave away marital funds. Although he claims the account is merely a conduit for the two, who share an apartment, to pay the bills, [the appellant] is clearly depositing marital assets into this account. Arezo testified that she does not make any deposits into the account—she merely spends it. Therefore, the Court will consider $3,823.00 (the original deposits) to be marital property.

With respect to the Jeep, the appellant argues that the trial court never determined that his transfer of the property to his daughter was for other than family purposes and with the intent of reducing the amount of funds available to the court for equitable distribution. He asserts that the evidence was to the contrary: that the transfer was to benefit Arezo, and therefore was for family purposes.

Judge Sundt's written opinion makes clear that she was aware of the elements that must be proven to establish dissipation of marital property, and of the proper allocation of the burden of production and persuasion on that issue. Moreover, and in answer to the appellant's point, Judge Sundt plainly found that the appellant's transfer of ownership of the Jeep to his daughter was not a gift made to benefit the family. Indeed, the judge referred to the transfer as a "gift"—making clear that she was rejecting the appellant's contention that it was a gift at all. Judge Sundt's written opinion constitutes a finding that the appellant transferred title of the Jeep not in order to benefit the family, but to remove it from equitable distribution.

With respect to the cash deposited in the Sequoia account in August 1999, the appellant argues that the trial court erred in concluding that he dissipated the property because 1) he gave it to Arezo before the parties separated; and 2) the funds no longer exist, and therefore should not be included in marital property. There is no merit to either argument.

First, dissipation of marital property can be found "where one spouse uses marital property for his or her own benefit for a purpose unrelated to the marriage at a time where the marriage is undergoing an irreconcilable break-down." *Sharp v. Sharp*, 58 Md.App. 386, 401, 473 A.2d 499 (1984). The evidence in this case supported a finding that when the appellant deposited money into the Sequoia account in August 1999 the marriage was undergoing an irreconcilable breakdown, even though the parties did not physically separate until the following month.

Second, the doctrine of dissipation permits the court to include, as extant marital property, marital property that was transferred, spent, or disposed of in some fashion by one of the spouses, under the circumstances described above. *See Jeffcoat v. Jeffcoat, supra.* Marital property found to have been dissipated is valued as of the time of dissipation. *Hollander v. Hollander*, 89 Md.App. 156, 170, 597 A.2d 1012 (1991). Thus, in this case, it was irrelevant that the marital funds first deposited in the Sequoia account in August 1999 no longer existed at the time of trial. Having properly found that those funds were dissipated by the appellant, the trial court was entitled to treat the funds as if they still were in existence. Indeed, that is the very purpose of the doctrine of dissipation.

## V

Finally, the appellant contends that the trial court erred in valuing his jewelry based on the appellee's testimony about the sums she paid for it.

On the parties' Rule 9–206 statement, the appellant valued his jewelry at $900, and the appellee valued his jewelry at $4,000. At trial, neither party presented expert testimony about the value of the appellant's jewelry. The appellant testified that his items of jewelry that were purchased during the marriage, and therefore were marital property, consisted of a gold watch and a "couple of crosses." When asked the basis for his assertion in the Rule 9–206 statement that his jewelry was worth $900, he replied: "I [sic] actually comparing to my wife's jewelry. This should be $900. $900. I assume that way." When asked whether he knew what the items were worth when purchased, at retail, he said that one item was purchased for $375 and one was purchased for $1,200. (He did not specify what items he was talking about.)

In her testimony, the appellee described with particularity the items of jewelry belonging to the appellant that she had purchased for him during the marriage: a 14 karat gold ring with a diamond; an 18 karat gold bracelet, containing about 110 grams of gold; a 14 karat gold watch; two pendants; and a 22 inch 18 karat gold chain to go with the pendants. She testified that she paid approximately $4,300 for those items.

In her written opinion, Judge Sundt made the following finding about the appellant's jewelry:

Both parties testified as to the amount of jewelry they currently own. [The appellant] claimed on the 9–206 statement that the value of his jewelry was $900, while [the appellee] valued the jewelry at $4,000.00. During his testimony, [the appellant] again stated that the value of his jewelry is $900.00 without offering any basis for his conclusion. Even upon his own attorney giving him an opportunity to account for the value, [the appellant] failed to do so. [The appellee] based her valuation on her statement (uncontroverted) that she was the one who actually purchased her husband's jewelry. The court will adopt the value of $4,000.

The appellant complains that the trial court was obligated to value his jewelry by its fair market value; that there was no evidence of his jewelry's fair market value; and that the trial

court erred in valuing it based on the appellant's testimony. There is no merit to this argument.

In the absence of expert testimony by an expert witness, the court looked to the testimony of the parties to ascertain the fair market value of the appellant's jewelry. The appellant did not fully identify the jewelry he owned, and did not give any basis whatsoever for the $900 he claimed the jewelry was worth. Judge Sundt rejected his testimony, as she was entitled to do. The appellee gave precise testimony about the appellant's jewelry, which was 14 and 18 karat gold, and in one case included a diamond, and testified that the retail purchase price of the jewelry totaled $4,300. The court reasonably could infer from that testimony that the fair market value of the gold and diamond jewelry was $4,000, a sum slightly less than its retail value when purchased.

We note, in addition, that even if the court had erred in valuing this marital property, which it did not, the error would be harmless. The court divided the marital property by title, and did not grant the appellee a monetary award. As we have discussed, the appellant did not request a monetary award. Thus, had the court valued his jewelry at a lower amount, he would not have been in any different position than he is now. He would have the jewelry, whatever its value, and would not have a monetary award, because he did not request one.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**