SHARER, J.
The parties to this appeal, Mukut K. Dave and Susan E. Steinmuller, were divorced by judgment of the Circuit Court for Baltimore County, Hon. Michael J. Finifter presiding. Mukut K. Dave, appellant, seeking to enhance his substantial monetary award and alimony allowance, takes exception to certain of Judge Finifter’s fiscal determinations.
After a three day trial, the court filed a memorandum opinion and judgment of divorce, granting Dave an absolute *657 divorce. The court ruled the parties’ premarital agreement invalid and unenforceable; thus, it proceeded to determine the status of property as marital or nonmarital, valued the property, and made a disposition.
The court ordered the sale of the jointly titled marital home and an equal division of the proceeds;[1] ordered the parties’ joint Charles Schwab brokerage account to be divided equally; ordered Steinmuller’s pension to be distributed according to the Bangs formula, with Dave to receive one-half of 78/300 of each monthly payment; ordered that appellant receive one-half of the marital portion of Steinmuller’s deferred compensation account (valued at $157,248); granted Dave a monetary award in the amount of $24,397; awarded Dave rehabilitative alimony of $27,000 per year for two years; and awarded Dave attorneys’ fees of $16,000 and expert witness fees of $2,000. In total, appellant’s severance package was worth nearly $450,000, not including the portion of Steinmuller’s pension benefit paid to him each month.
In his timely appeal, Dave presents for our review four questions, which we have consolidated and rephrased:[2]
I. Did the circuit court abuse its discretion in its determination that the Legg Mason securities account was not marital property?
*658 II. Did the circuit court commit error in not awarding indefinite alimony, and in the amount of alimony ordered?
III. Did the circuit court abuse its discretion in the award of attorneys fees to appellant?
We answer all of appellant’s questions in the negative, and therefore shall affirm.
FACTUAL and PROCEDURAL HISTORY
At the time of trial, Dave was 56 years of age and Steinmuller was 61. Dave was born in India and educated there, having obtained a bachelor’s degree in electrical engineering and a master’s degree in business administration (MBA). In India, he was employed as a media planner, manager, and director in advertising agencies. He arrived in the United States in 1976 on a student visa,[3] and later worked for two advertising agencies in Chicago, until 1982 when he was laid off. In January 1983, he was hired as a media director by a Baltimore advertising agency.
Steinmuller was an employee of the City of Baltimore, before and during the marriage. The parties met in August 1984, and were married in January 1985, in Baltimore. Within a few days of becoming engaged, Steinmuller informed Dave that she wanted a prenuptial agreement. She presented him with a prepared agreement, which he signed on the evening before they were married.[4]
Dave obtained permanent resident status in the United States by virtue of the marriage. Steinmuller continued in her employment with the City of Baltimore through 1991, *659 when she retired. Dave continued to work for the advertising agency in Baltimore until he was terminated in 1985, at which time he began freelancing, with minimal success, in the media planning and market research areas until March 1987. He testified that he could not find advertising jobs in the Baltimore/Washington metropolitan area. After his unsuccessful job search, the parties agreed that he would manage Steinmuller’s investment portfolios.[5] Dave stated that he took this on as if it were his full-time employment and, in the ensuing years, dedicated an average of 30 hours each week to the financial management.[6]

The Brokerage Accounts

Steinmuller had a premarital account with Edward Yiner. Her inherited funds were placed into a separate account with Alex Brown. In April 1986, Steinmuller and Dave attended a meeting, at Steinmuller’s insistence, with her broker at Alex Brown to discuss the evaluation of her holdings in the Viner and Alex Brown accounts. Dave testified that at that time he performed a detailed analysis of the portfolios, and he and Steinmuller discussed the broker’s recommendations. Steinmuller allowed Dave to make decisions on the spot, rejecting some, and accepting some, of the broker’s recommendations. She acknowledged that Dave’s knowledge of investments was greater than her own.
When Dave assumed the management of the accounts, the Alex Brown account consisted of 19 different stocks; 13 stocks were held in the Viner account. At that time, the combined portfolios were apportioned nearly equally in tax free bonds, cash, and equities. Dave’s approval was required of any decisions by Alex Brown about the account. On occasion his decisions were made contrary to the broker’s recommendations.
*660 In November 1987, Dave, with Steinmuller’s approval, transferred the Alex Brown account to Smith Barney. Prior to the transfer of the account, Dave went to New York alone to interview Smith Barney representatives. On October 27, 1987, Dave and Steinmuller signed signature cards and a securities account agreement with Smith Barney. Steinmuller also executed a trading authorization, conferring upon Dave full authority to purchase and sell securities on her account through Smith Barney. Notwithstanding the trading authorization, the Smith Barney account remained in the sole name of Steinmuller, resulting from the merger with the previous Alex Brown account. Later, in 1990, Steinmuller’s Viner account was merged into the same Smith Barney account. Ultimately, in 1997, the Smith Barney account was closed and its assets transferred to an account with Charles Schwab.
A Merrill Lynch account, originally in Dave’s name only, later became a joint account. It too was moved to Smith Barney.
At the time of the parties’ separation on March 21, 2001, Dave’s management of the investment account terminated. Steinmuller then moved the account to Legg Mason. On March 31, 2001, the account had a value of $4,049,371.64.

Other Accounts

Steinmuller’s individual retirement account (IRA) had a value of $22,933 at the time of the divorce. The joint Charles Schwab account had a value of $144,170 on February 28, 2003.

Income and Expenses

Evidence was produced of the incomes of the parties, ranging from $89,210 in 1985 to $141,628 in 2000. In the years that the parties filed joint income tax returns their income averaged more than $107,000. At the time of trial, Steinmuller had a gross monthly income of $9,430 and net monthly income of $8,354. She was not yet drawing Social Security benefits. She claimed monthly expenses of $8,175, including $2,400 in temporary alimony she was paying to Dave, and non *661 recurring legal expenses relating to the divorce in the amount of $1,370.
Steinmuller’s assets included real estate valued at $200,000 (one-half of the $400,000 value of the marital home); Municipal Employees’ Credit Union (“MECU”) savings of $54,892 and checking of $1,688; a First Union account of $15,545; the Legg Mason account of $3,130,599 (as of February 20, 2003); the Schwab account of $72,235 (one half of the joint account of $144,470); United States bonds in the amount of $3,175; deferred compensation of $384,011 as of December 31, 2002; an IRA with a value of $22,933; jewelry valued at $14,000; and an automobile valued at $1,015. Receivables included $16,546 due from a Federal tax refund and $4,514 due from a Maryland tax refund. Her total net worth was $3,925,243.
Dave, who was still unemployed at the time of trial, had income of $2,849.01 per month, $2,400 of which was the temporary alimony, against monthly expenses of $6,547. His assets consisted of one-half of the value of the $400,000 marital home; one half of the $144,470 joint Schwab account; a Merrill Lynch IRA in the amount of $10,541; a 1993 Mazda valued at $4,944; a checking account of $1,044; a savings account of $18,855; and a Schwab IRA valued at $1,044. On the other side of the ledger, he listed $60,044.88 in liabilities, including $23,472.96 in attorneys’ fees. The remainder was credit card debt which he testified was incurred to fund the litigation.

Standard of Living

The parties enjoyed a high standard of living during their marriage. In December 1986, Steinmuller purchased the real estate known as 4403 Langtry Drive, Phoenix, Maryland. In October 1992, she conveyed the property to herself and Dave, jointly. The home was a four bedroom, four bathroom, two car garage, colonial home that was well-landscaped on two acres, with a swimming pool and tennis court. They dined out frequently and traveled extensively within the United States and abroad, including Mexico, England, Portugal, Hong Kong, *662 India, Germany, China, Australia, New Zealand, Switzerland, and France.
Steinmuller retired in 1991, after which the parties spent a great deal of time together. They shared housekeeping duties. She made coffee in the morning and cleaned the kitchen at night, and also did the laundry. Dave testified that he did all the cooking, all exterior maintenance of the house, and almost all other household chores.
Steinmuller told the court that Dave was a cheerful person at the beginning of the marriage, but that he became both physically abusive and verbally threatening. In contrast, Dave claimed that his wife suffered from depression during the marriage and became quiet and withdrawn. They formally separated on March 21, 2001, when Steinmuller left the marital home.

The Trial

The case was tried on April 7, 8, and 9, 2003. On July 9, 2003, Judge Finifter filed a thorough memorandum opinion and entered a judgment of divorce. The court granted Dave an absolute divorce; found the parties’ premarital agreement invalid and unenforceable; and ordered the sale of the jointly titled marital home and an equal division of the net proceeds, ordered equal division of the joint Charles Schwab brokerage account, ordered that Dave would receive a portion of Steinmuller’s pension based upon 50% of 78/300 of each monthly payment, and that Dave receive 50% of the marital portion of Steinmuller’s deferred compensation account ($157,248). In addition, the court granted Dave a monetary award of $24,397, awarded him rehabilitative alimony in the amount of $27,000 per year for two years. Lastly, Dave was awarded attorneys’ fees of $16,000 and expert witness fees of $2,000.
Specifically, Judge Finifter concluded that Dave had not met his burden of proving that any amount of the Legg Mason portfolio ($3,130,599) was marital, and that he did not prove that the accretion to the portfolio during the marriage was the result of his efforts. Appellant noted this appeal.
*663 DISCUSSION

I. Did the circuit court abuse its discretion in its determination that the Legg Mason securities account was not marital property?

(1) This aspect of the appeal is governed by Md.Code (1999 Repl. vol.), Fam. Law §§ 8-201 to 213, otherwise known as “The Marital Property Act” (“Act”). Section 8-201 defines marital property:
(e)(1) “Marital property” means the property, however titled, acquired by 1 or both parties during the marriage.
(2) “Marital property” includes any interest in real property held by the parties as tenants by the entirety unless the real property is excluded by valid agreement.
(3) Except as provided in paragraph (2) of this subsection, “marital property” does not include property:
(i) acquired before the marriage;
(ii) acquired by inheritance or gift from a third party;
(iii) excluded by valid agreement; or
(iv) directly traceable to any of these sources.
Fam. Law § 8-201 (e) (1999 Repl.Vol.).
The purpose of this provision is to provide a method for equitably distributing certain property of the spouses. Jandorf v. Jandorf, 100 Md.App. 429, 437, 641 A.2d 971 (1994). In determining marital and nonmarital property, Maryland follows the “source of funds” theory:
[u]nder the Maryland Act the appropriate analysis to be applied is the source of funds theory. Under that theory, when property is acquired by an expenditure of both non-marital and marital property, the property is characterized as part nonmarital and part marital. Thus, a spouse contributing nonmarital property is entitled to an interest in the property in the ratio of the nonmarital investment to the total nonmarital and marital investment in the property. The remaining property is characterized as marital property and its value is subject to equitable distribution. Thus, the spouse who contributed nonmarital funds, and the marital *664 unit that contributed marital funds each receive a proportionate and fair return on their investment.
Pope v. Pope, 322 Md. 277, 281-82, 587 A.2d 481 (1991) (citing Harper v. Harper, 294 Md. 54, 80, 448 A.2d 916 (1982)). “Under the statute, a gift made to only one of the spouses is not marital property; a gift to both spouses may be marital property, depending upon the nature of the gift.” Paradiso v. Paradiso, 88 Md.App. 343, 358, 594 A.2d 1200, cert. denied, 325 Md. 95, 599 A.2d 447 (1991).
A spouse who owns nonmarital property is permitted to preserve its nonmarital status even if it changes in character or form during the marriage, as long as the spouse can trace the asset acquired during marriage directly to a nonmarital source. With regard to traceability, we opined in Melrod v. Melrod, 83 Md.App. 180, 574 A.2d 1, cert. denied, 321 Md. 67, 580 A.2d 1077 (1990):
FL § 8-201(e)(2)(iv) is quite specific; it excludes from marital property any property acquired during the marriage that is directly traceable to a non-marital source. “Directly traceable” is not synonymous with “attributable.” ... This inability to trace property acquired during the marriage directly to a non-marital source simply means that all property so acquired was marital property.
Id. at 187, 574 A.2d 1 (emphasis in original) (citing Brodak v. Brodak, 294 Md. 10, 447 A.2d 847 (1982)). “[T]he judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses.” Brodak, supra, 294 Md. at 26, 447 A.2d 847 (quoting former Maryland Rules 886 and 1086)

Securities Accounts and Husband’s Involvement

Dave testified that he dedicated an average of 30 hours per week in activities dedicated to managing Steinmuller’s portfolio. His daily activities, from 1986 until the parties separated, consisted of research of the markets, including reading daily flagship publications and watching various financial programs *665 on cable and network television. He followed a detailed process in determining whether to buy or sell stocks, reviewing publications such as Value Line, The Wall Street Journal, and Business Week.
He created a test of 15 factors that he used to evaluate a particular company and applied his own detailed analysis based on the stability of earnings and assets. Shares of a particular company would not be purchased unless all 15 of his test factors were satisfied. His factors included an analysis of price to book value, price to earnings, price to earnings on a three year average, continuity over five years and ten years, interest coverage, dividends over the past twenty years, the current ratio, and net current assets versus long term debt.

The Expert Testimony

David Citron, an investment expert and chartered financial analyst, testified as an expert for Dave in the field of portfolio evaluation and analysis. In analyzing the portfolio, Citron went through each monthly statement, entered all transactions, and charted the cash flow. He accounted for living expenses, and determined the performance for each time period. He opined that the overall performance of the portfolio, without fixed income from December 31, 1985 to August 31, 2000, under a time-weighted net analysis, was 16.09%. The portfolio value during that period increased to $3,998,879.21.
An average of approximately 10% of the portfolio was in cash in a money market account, which was considered to be an “anchor,” returning significantly less than stocks. Citron, whose written report was introduced into evidence, concluded that Dave had done a “very, very good job” in his management of the portfolio. The performance would have put him in the top quartile of all managers of mutual funds. His report reflects that an average investor received a 5% annual return in the decade of the 1990’s. As to the heart of the matter, however, Citron testified that he could not quantify the extent to which Dave’s efforts, as contrasted with the rise in productivity in the United States, the tax environment, rising corporate earnings, rising personal income, and an increased accep *666 tance of risk among United States investors, contributed to the increase in the value of the portfolio.
Steinmuller’s expert, Joel Morse, Associate Dean of the Merrick School of Business at the University of Baltimore, and former Director of the Division of Economics, testified that the U.S. securities markets were successful from 1987 through 2001. He attributed that success to a number of factors, including an economy with rising productivity and an acceptance of equity risk by investors; a rise in the price/earnings multiplier; a stable tax environment; a rising stream of corporate earnings; and rising personal income, all allowing for the purchase of financial assets by households.
Morse testified that these factors explained substantially why the Standard and Poor’s (“S & P”) 500 Index[7] and the individual investing experience of many people did well in that period. Morse disagreed with Citron’s assessment of the quality of Dave’s management performance, noting that he underperformed the S & P Index. He conceded that there were many other indices to which he did not compare the portfolio.
Dave posits that at least a portion of the accretion of the portfolio value, as a result of his efforts, has been transformed from nonmarital to marital property. He argues that his efforts bring him within the rule of the Court of Appeals’ decision in Brodak, supra, because, although not a titled owner of the accounts, he put forth work efforts throughout the marriage in managing the portfolio, for which he received no compensation. He asserts that his active management, including the buying, selling and holding of stocks, resulted in the acquisition of additional assets to the portfolio and its substantial increase in value. Dave asks us to focus on his effort, and to find error in the trial court’s refusal to quantify his marital component “however large or small.” He notes his *667 investment expertise, citing Steinmuller’s admitted inferior knowledge and her willingness to allow him to control the portfolio.[8]
Steinmuller relies on the fact that her premarital and inherited assets continued to be held in her name only. While she concedes, as she must, that Dave was the primary manager of her accounts, she argues that there were numerous economic and market factors that contributed to the increase in the portfolio’s value.
In our review of Judge Finifter’s detailed analysis of the issues presented to him, we find neither error nor abuse of discretion. In McNaughton v. McNaughton, 74 Md.App. 490, 538 A.2d 1193 (1988), relied upon by the trial court, we were called upon to determine whether the appreciation of nonmarital stock in a family business could be considered a marital asset where the appreciation was purported to be due to the labor and efforts of the owner/husband, who also served as an officer in the company during the marriage. The trial court determined that the appreciation was not necessarily the result of husband’s efforts, for he was but one of many people who contributed to the success and growth of the family business.
In affirming, we held that “no evidence was presented from which the chancellor could form any basis, other than speculation, as to what proportion, if any, of the increase in the initial non-marital shares was attributable to [the husband’s] work as an officer and employee in the [family business].” McNaughton, supra, 74 Md.App. at 501, 538 A.2d 1193. In its reliance on McNaughton, the trial court in the instant case held:
The [McNaughton ] case is substantially on point to the case sub judice. As in [.McNaughton ], the case at hand involves an increase in stock value and a party’s claim that *668 such increase can be directly attributed to efforts expended during the marriage. The Court of Special Appeals stressed that the increased value of the stock was caused by numerous external factors, and the Court would have needed to speculate as to the amount of increase in the stock caused by the husband. The same situation applies in the case sub judice; numerous factors affected the increase in the portfolio value, and the Court finds that [Husband] did not present sufficient evidence to allow the Court to determine what portion, if any, of the increase in the portfolio value was attributable to [Husband].
The experts for both parties testified as to the numerous factors affecting the Portfolio. [Husband’s] expert, David Citron, indicated that: the United States equity markets rose at substantial rates during most of the 1990’s, in part due to a stable tax environment, at a time when the Portfolio achieved its greatest gains; the rise in productivity in the United States during the 1990’s had a positive effect on the Portfolio, as well as rising corporate earnings; and rising personal income in the United States had an impact on the Portfolio. Ultimately, Citron asserted that he could not “quantify the extent to which any of the factors .... contributed to the increase in [Wife’s] portfolio.” For the Court to ascribe a particular value of the increased portfolio to the Plaintiff would require speculation, particularly when considering that [Husband’s] control and influence does not rise to the level of control of the husband in [McNaughton ]; in accordance with the court in [.McNaughton ], this Court should, therefore, attribute the value as a non-marital increase.
Dave argues that the trial court misinterpreted McNaughton by stating that he did not have the level of control and influence as did the husband in that case, in which it was ultimately concluded that the husband did not have sufficient control to influence the appreciation. We find Dave’s argument to be misplaced. We read Judge Finifter’s reasoning to be that Dave had even less control than did McNaughton, and that any addition to the value of the portfolio is even more *669 speculative. The lesson of McNaughton is that such a determination may not be based on mere speculation. Here, the trial court specifically found that the evidence was lacking to attribute the appreciation to Dave’s efforts, to the exclusion of extrinsic factors, such as market conditions.
Dave’s own expert testified that he was unable to “quantify the extent to which any of the factors [to which he had testified] contributed to the increase in [the] portfolio.” Thus, he was unable to identify what portion of the appreciation, if any, was attributable to Dave’s efforts as opposed to other recognizable market or economic forces. The trial court was correct to conclude that only by engaging in speculation could he assign any of the increase to appellant’s efforts.
Dave presents his conclusion as a sylogism: the value of the portfolio increased; he devoted much time and effort to management of the portfolio; hence, the increase is attributable to him. However, beyond showing that he devoted considerable time to the portfolio management, he was unable to provide sufficient probative evidence of how his efforts resulted in the increase in value of the portfolio. There was simply no evidence from which the trial court could have quantified what portion of the appreciation was the result of appellant’s efforts, as opposed to other factors. The trial court properly declined to speculate.
Further, his claim to exclusive control of the portfolio is not bolstered by his authority to accept or reject the broker’s suggestions. The portfolio was still formally managed by the brokerage firm which assigned a financial advisor to the account, as evidenced by the Securities Account Agreement with Smith Barney that authorized transactions be made by the account manager or advisor.
Dave’s reliance on Brodak, supra, and other non-transformation cases is misplaced. In Brodak, a trailer park was conveyed to the husband by his parents during the marriage. The Court of Appeals affirmed the trial court’s determination that the trailer park was marital property, as income from it, which provided funds to purchase additional trailers, “was *670 partly generated through the efforts of the wife and thus cannot be said to be directly traceable to the gift.” Brodak, supra, 294 Md. at 27, 447 A.2d 847. The wife worked at the trailer park and took care of all bookkeeping, paid the bills, and collected the rents. Id. at 26-27, 447 A.2d 847.
Here, the trial court properly distinguished the efforts of Dave from the efforts of the wife in Brodak. The court in Brodak did not have to speculate about the wife’s contribution to the trailer park business, because her efforts clearly contributed to the income and growth, allowing for the purchase of additional trailers. In contrast, Dave was employed outside the home for only a minimal time during the marriage and provided little, if any, financial contribution to the household. Notably, he made no monetary contribution to the portfolio. In fact, Steinmuller withdrew funds from the investment accounts to supplement her pension for the benefit of the parties. We agree with the trial court’s conclusion that, “Unlike the [Brodak ] case that involved a small business where impacts can be directly traced to individual efforts, the case at hand involves equities and the many factors that influence their prices.”
Appellant has cited several cases from the courts of California and Florida and has asked us to apply the reasoning of those cases. We decline the invitation. Property disposition in divorce cases in Maryland is governed by statute and the appellate courts have had numerous opportunities to interpret and apply that statutory scheme. Were this a case of first impression, and were the foreign statutes substantially similar to the Maryland statute, we might be so inclined. We are not.

Traceability of Portfolio to Wife’s Non-Marital Property

Dave takes the position that, because the majority of the securities and investments owned by his wife before the marriage, and those inherited by her during the marriage, were not the same as those owned by her at the time of trial, the character of the assets has changed. In other words, by selling premarital shares in A, Inc. and buying shares in B, Inc. during the marriage, the assets become marital property, *671 even though still titled in Steinmuller’s name. He also argues that the addition of his nonmarital Merrill Lynch account (originally titled in only his name, later jointly titled during the marriage) to Steinmuller’s individually titled accounts with Smith Barney, constitutes a commingling of funds, resulting in all becoming marital property. His argument is faulty, for even if a spouse commingles funds, the character of the nonmarital property may be preserved if its origins can be traced to nonmarital property. See Melrod v. Melrod, 83 Md.App. 180, 574 A.2d 1 (1990). Steinmuller’s funds, titled in her name, were easily traceable to her nonmarital funds. See Melrod, supra, 83 Md.App. 180, 574 A.2d 1.

II. Did the circuit court commit error in not awarding indefinite alimony, and in the amount of alimony awarded?

In determining alimony, the court must look to Fam. Law ll-106(b):
In making the determination, the court shall consider all the factors necessary for a fair and equitable award, including:
(1) the ability of the party seeking alimony to be wholly or partly self-supporting;
(2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;
(3) the standard of living that the parties established during their marriage;
(4) the duration of the marriage;
(5) the contributions, monetary and nonmonetary, of each party to the well-being of the family;
(6) the circumstances that contributed to the estrangement of the parties;
(7) the age of each party;
(8) the physical and mental condition of each party;
(9) the ability of the party from whom alimony is sought to meet that party’s needs while meeting the needs of the party seeking alimony;
*672 (10) any agreement between the parties;
(11) the financial needs and financial resources of each party, including:
(i) all income and assets, including property that does not produce income;
(ii) any award made under §§ 8-205 and 8-208 of this article;
(iii) the nature and amount of the financial obligations of each party; and
(iv) the right of each party to receive retirement benefits; and
(12) whether the award would cause a spouse who is a resident of a related institution as defined in § 19-301 of the Health—General Article and from whom alimony is sought to become eligible for medical assistance earlier than would otherwise occur.
(c) The court may award alimony for an indefinite period, if the court finds that:
(1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting; or
(2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.
The purpose of alimony is not to provide a lifetime pension for a spouse, but to provide financial support to an economically dependant spouse until he or she becomes self-supporting. Wassif v. Wassif, 77 Md.App. 750, 755, 551 A.2d 935, cert. denied, 315 Md. 692, 556 A.2d 674 (1989).
Alimony may be awarded for an indefinite period if the court finds that
(1) due to age, illness, infirmity, or disability, the party seeking alimony can not reasonably be expected to make substantial progress toward becoming self-supporting, or (2) even after the party seeking alimony will have made as *673 much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably desperate.
Md.Code, Fam. Law § 11—106(c).
Alimony is intended primarily to permit a recipient spouse to become self-supporting, rather than to enable a dependent spouse to maintain a previously accustomed standard of living. Maryland law favors rehabilitative alimony over indefinite alimony. Tracey v. Tracey, 328 Md. 380, 614 A.2d 590 (1992). Indefinite alimony should be awarded only in exceptional circumstances. A trial court’s finding regarding unconscionable disparity is a finding of fact, reviewed under the clearly erroneous standard. Roginsky v. Blake-Roginsky, 129 Md.App. 132, 143, 740 A.2d 125 (1999); Karmand v. Karmand, 145 Md.App. 317, 330, 802 A.2d 1106 (2002).
The trial court found that Dave’s “education skills, work experience and intelligence indicate that he possesses the ability to be wholly self-supporting within a short period of time” and that two years would be a reasonable time in which Dave could become self-supporting. Lee Mintz, called as a vocational rehabilitation expert by Steinmuller, prepared an employability assessment of Dave. Mintz testified about the possible fields of employment that Dave could enter. She performed a survey that located eleven companies in the brokerage field that she felt would be interested in an individual with Dave’s background, with first year incomes ranging from $35-40,000 and perhaps higher. Mintz indicated that there were a variety of training programs, all of less than two years’ duration, which would additionally improve his qualifications for positions in the financial advisory or stock broker field. She also indicated that there were a variety of other types of jobs, such as teaching, bank management, loan and finance company management, car rental management, and mortgage loan officer positions for which Dave could be qualified given his background and training. With short term training, she opined that incomes were in the range of $30- *674 40,000 for the positions she mentioned, with some incomes even higher.
Dave had submitted applications to between 80 and 85 companies and had three interviews, without success. He applied for jobs at brokerage firms. He applied to be an immigration inspector with the Immigration and Naturalization Service in Bangor, Maine, which paid $25,697 per year. There was some evidence that it would be virtually impossible for him to get a job in advertising, given his age and his having been out of the field for fifteen years.
Dave argues that the fact that he speaks with a heavy accent, was 56 years of age at the time of trial, and had not worked outside the home in 18 years, does not bode well for his future employment. He contends that it is “simply unreasonable” to expect that he enter the labor force at nearly age 60 and find suitable employment to be self-supporting. Dave further complains that he will have to exhaust his own assets in order to survive.
Steinmuller points out that Dave has a degree in engineering and the equivalent of an MBA. She also turns his assertion of investment success into her argument that his fifteen years of experience of management of her accounts, at which his expert witness said he did very well, makes him employable. She cites in addition, Mintz’s indication that there are a variety of training programs, two years in duration, which would improve appellant’s qualifications for employment in the investment industry.
Claims by Dave that his “advanced” age of 56 will prevent him from re-entering the workforce are incongruous in light of his repeated iteration of his overwhelming success in managing Steinmuller’s portfolio. It is not unreasonable to conclude that an individual with a degree in engineering, an MBA, and extensive investment experience could find employment in a related industry, and could certainly improve his chances of being hired with two years in which to seek additional training to enhance his qualifications.

*675
III. Did the circuit court abuse its discretion in the award of attorneys fees to appellant?

“ ‘The award of fees and costs is within the sound discretion of the trial court, and such an award should not be modified unless it is arbitrary or clearly wrong.’ ” Barton v. Hirshberg, 137 Md.App. 1, 32, 767 A.2d 874 (2001) (quoting Rosenberg v. Rosenberg, 64 Md.App. 487, 538, 497 A.2d 485, cert. denied, 305 Md. 107, 501 A.2d 845 (1985)). The court must also assess the reasonableness of the fees, “taking into account such factors as labor, skill, time, and benefit afforded to the client, as well as the financial resources and needs of each party.” Petrini v. Petrini, 336 Md. 453, 467, 648 A.2d 1016 (1994). An award of counsel fees is within the discretion of the presiding trial judge. Such awards are subject to appellate review, but will not be disturbed unless it is shown that the discretion was exercised arbitrarily or the judgment was clearly wrong. Danziger v. Danziger, 208 Md. 469, 118 A.2d 653 (1955); Bennett v. Bennett, 197 Md. 408, 79 A.2d 513 (1951).
Dave asserts that the award was nominal, only 17% of his total counsel fees, and thus the court abused its discretion. We note that prior to addressing attorneys fees, the court determined that Dave would receive $272,235 from the parties’ jointly titled assets, more than $78,000 from Steinmuller’s deferred compensation plan, and a monetary award of $24,397. Additionally, the court was aware that, post-separation, he had been living in the marital home, all of the expenses of which were paid by Steinmuller from her funds; was covered by Steinmuller’s health plan; and received $2,000 per month in alimony from June 1, 2001.
We find no abuse of discretion in the court’s award of attorneys fees.
JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED; COSTS ASSESSED TO APPELLANT.

. The home had been purchased by Steinmuller prior to the marriage, but was titled in their joint names during the marriage.

. As presented in his brief, appellant's issues are:
I. THE LOWER COURT COMMITTED REVERSIBLE ERROR IN FINDING APPELLEE’S ENTIRE INTEREST IN HER LEGG MASON PORTFOLIO WAS NOT MARITAL PROPERTY AND THAT DESPITE APPELLANT’S WORK EFFORTS WAS THE NON-MARITAL PROPERTY OF APPELLEE
II. THE LOWER COURT COMMITTED REVERSIBLE ERROR IN FINDING APPELLEE'S LEGG MASON PORTFOLIO WAS DIRECTLY TRACEABLE TO HER NON-MARITAL PROPERTY IN VIEW OF THE COMMINGLING OF THE PORTFOLIO
III. THE LOWER COURT COMMITTED REVERSIBLE ERROR IN ONLY GRANTING APPELLANT $27,000 PER YEAR IN ALIMONY AND IN NOT MAKING AN INDEFINITE AWARD.
IV. THE LOWER COURT COMMITTED REVERSIBLE ERROR IN ONLY AWARDING APPELLANT $16,000 IN COUNSEL FEES.

. He enrolled in a master’s program at Northwestern University at this time, but quit the program and remained in the United States illegally. He informed wife of his immigration status prior to the marriage.

. While husband is careful to describe the circumstances surrounding the signing of the prenuptial agreement, the circuit court's finding that the agreement was invalid and unenforceable is not at issue in this appeal.

. In 1985, shortly after the parties were married, Steinmuller inherited $1,095,953 from her mother’s estate.

. The extent of his management of the portfolio will be discussed further, infra.

. The Standard and Poor’s 500 Index is an index consisting of 500 stocks chosen for market size, liquidity, and industry group representation. It is a market-value weighted index, with each stock’s weight in the index proportionate to its market value.

. Dave's notation of the performance of Steinmuller’s IRA, which she controlled during the marriage, does little to support his arguments regarding management of the portfolio. Steinmuller admitted that Dave mainly handled the portfolio, as she had little experience in this area.