957 A.2d 1038

**Keith A. LEE**

v.

**Lori L. ANDOCHICK.**

No. 2598, Sept. Term, 2006.

Court of Special Appeals of Maryland.

Oct. 3, 2008.

270

Jerrold A. Thrope (Sheila K. Sachs, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, on brief), Baltimore, for Appellant.

Vincent M. Wills (Patrick W. Dragga, on brief), Rocville, for Appellee.

Panel: SALMON, CHARLES E., MOYLAN, JR., Ret. Specially Assigned, and RAYMOND G., THIEME, JR., Ret. Specially Assigned, JJ.

SALMON, J.

Keith A. Lee, appellant, has a projected salary for 2006 of $1,760,282.00 annually and, after taxes, a net income of $998,000.00. Appellee-cross-appellant, Dr. Lori Andochick, a dentist, grosses $267,000.00 per year. Her after-tax income (without alimony) is approximately $203,300.00 per year.[1]

After a trial in the Circuit Court for Frederick County, the court granted Dr. Andochick an award of 1) indefinite alimony in the amount of $10,000.00 per month starting January 1, 2007; 2) child support in the amount of $15,000.00 per month; 3) a monetary award of $1,250,000.00 payable at the rate of $250,000.00 per year for five years; and 4) attorney's fees of $150,000.00. Additionally, Mr. Lee was ordered to pay for the cost of his children's private school, including tuition, transpor-

---

1. The estimate of Dr. Andochick's net income, without alimony, is based on the testimony provided by Jeffery Capone, an expert called by Dr. Andochick. His calculation assumed that Dr. Andochick would receive an award of alimony in the amount of $20,000.00 per month. Our estimate of tax liability concerns taxes due on an income of $267,000.00, but otherwise uses all of Mr. Capone's other assumptions.

tation, lunch, fees, and cost of extracurricular activities, which amounts to about $2,200.00 per month.

Under ordinary circumstances, requiring Mr. Lee to pay alimony and support payments totaling $326,400.00 a year *might* seem reasonable in light of his large annual income. But a factor that clouds the issue is the fact that he is burdened with almost $6,000,000.00 in debt and is required to pay over $635,000.00 annually in principal and interest on that debt.

For the reasons spelled out below, the judgment entered by the circuit court will be affirmed in part, reversed in part, vacated in part, and the case shall be remanded to the Circuit Court for Frederick County for further proceedings consistent with the views expressed in this opinion.

## I.

The parties married in October 1993, separated in May 2004, and were granted a judgment of absolute divorce on January 12, 2007. Two children were born of the marriage: Alexander, born July 10, 1995, and Olivia, born May 13, 1997. Since the commencement of the marriage, Mr. Lee has been employed by an investment firm known as "Brown Capital Management" ("Brown Capital"), a subchapter S corporation headquartered in Baltimore, Maryland. Mr. Lee was hired by Brown Capital in 1991 to create a division that would invest in small companies, on behalf of clients of Brown Capital. When he was hired in 1991, Mr. Lee was offered a choice as to how he would be compensated. The first option was to have an "industry competitive salary" and cash bonus each year. The second option was to be paid a "livable" wage which would be just enough money to pay his mortgage, feed his family, and cover his travel expenses. But if he chose the latter option, Mr. Lee would also receive a percentage of revenues generated by Brown Capital. Mr. Lee selected the second, more risky, option. His starting salary was $50,000.00. He was also offered, and accepted, an "entrepreneurial" option, which

allowed him the right to purchase 5% of the stock of Brown Capital at a later date.

About two years after the parties were married, in 1995, Brown Capital's business started to grow at a fast pace and the corporation began to acquire significant assets. Mr. Lee was offered the right to purchase another 5% of stock in Brown Capital. It was not, however, until 1999 that Mr. Lee exercised his options and purchased 10% of the corporation's stock. The purchase price for the stock was $837,500.00. To finance the purchase, he borrowed $670,000.00 from Eddie C. Brown, the chief stockholder of Brown Capital and its major-domo. A promissory note, evidencing this debt, required Mr. Lee to make quarterly payments to Mr. Brown of $17,365.43 through January 1, 2006, when the entire balance was to come due.

Mr. Lee acquired an additional 2,650 shares of Brown Capital in the period between 2000 and 2002. And, on September 30, 2003, he signed an agreement to buy 3,350 shares of the company for $2,696,750.00. The agreement provided that Mr. Lee was to pay $539,350.00 at the time that the agreement was signed, with the remaining principal and interest to be paid in five annual installments of $431,480.00. The terms of this agreement were later changed so that Mr. Lee was obligated to make a balloon payment of $2,013,573.00 on September 30, 2011, in lieu of annual installments. The revised interest due under this last mentioned note is $7,031.00 per month.

Mr. Lee's stock in Brown Capital was worth, as of the date of the divorce, $6,272,000.00. Currently, Mr. Lee owes Mr. Brown $2,506,869.00 on two promissory notes and, due to his stock purchases, he also owes Harbor Bank an additional $574,081.00. After subtracting the monies borrowed to make the stock purchases, the marital property value of the stock in Brown Capital was $3,191,050.00 as of the date of the divorce.

Currently Mr. Lee owns 16% of the stock in Brown Capital. His wages since 1999 have been: 2006: $1,760,282 [projected]; 2005: $2,336,631; 2004: $3,466,681; 2003: $2,526,512; 2002:

$4,339,411; 2001: $2,769,815; 2000: $2,503,049; 1999: $1,346,539.

Mr. Brown testified that from the end of 2004 to the end of 2005 there had been approximately a 50% drop ($5,278,000,-000.00 to $2,636,000,000.00) in the dollar amount of money invested by Brown Capital. Brown Capital lost "a number of clients" during that period and also lost the assets represented by those clients in that one-year period. The reason for the loss of clients was because Brown Capital's performance relative to that of other money managers did not meet certain industry benchmarks.

In regard to the issue of what income could be expected in the future, the trial judge in his written opinion said:

Mr. Brown testified that in the past few years [Brown Capital] has been less successful than it had been previously. He attributes the trend to a combination of factors: under performance of managed assets as compared to benchmarks i.e., Standard and Poors Index, a loss of clients and concomitant reduction in assets under management. He produced company records which demonstrate a downward trend.

[Mr. Lee's] compensation is determined by calculating 20.5% of fees generated by the Small Company Investment Services unit of BCM and 1.5% [of] fees generated by mid/large capitalization mutual funds. Mr. Brown testified that he granted the latter to [Mr. Lee] as an extra benefit to him. Those fees have diminished consistently in 2004 and 2005.

[Mr. Lee] attributes some of the decrease in income to his preoccupation with the pending divorce proceeding. He has deferred the filing of his 2005 income tax return, and the evidence he submits regarding that income is somewhat vague. However the court can ascertain that in 2005 he earned $468,061.00 in dividend distributions. His expert witness calculated his 2006 gross income will be $1,760,282.00.

Dr. Andochick finished dental school in December 1990. She was immediately hired by a small dental practice outside of Charlottesville, Virginia. After her 1993 marriage, Dr. Andochick regularly commuted from the home she and Mr. Lee shared in Frederick, Maryland to Charlottesville, Virginia. She would leave on Monday morning and drive to Charlottesville and stay with friends in that town until Thursday. She would then return to Frederick on Friday evening.

About two years after the parties were married, Dr. Andochick accepted an offer from her father to join his dental practice in Frederick. Since the fall of 1995, Dr. Andochick has continued to practice dentistry with her father. As of the date of trial, she works 32 hours per week and earns $267,000.00 annually.

Both of the parties are 46 years of age and are in good health. During the marriage, they enjoyed an "extravagant" lifestyle. The trial judge summarized his "lifestyle findings" as follows:

> The parties enjoyed a very high standard of living in the later part of their marriage as their wealth increased. During the years between 1999 and 2004, they jointly earned between $2.7 million and $3.6 million annually. They bought a mansion and spent great sums of money on its expansion. They went on extravagant vacations and traveled by private jet. They enjoyed their trips to Bermuda to such an extent that they seriously considered buying a vacation home there. The children are enrolled in private school and various extracurricular activities. The parties employed domestic help; [Dr. Andochick] has had at least one in-home assistant daily to assist with household maintenance and the transporting of children. They own four motor vehicles of substantial value.

## II.

### Construction of and Improvements to the Marital Home

The marital home mentioned in the excerpt just quoted is located at 7700 Fingerboard Road in Frederick County. The

home was completed in March 1998 on property that was purchased, pre-marriage, by Mr. Lee. The home as originally built was huge, containing almost 7000 square feet above grade and a 5000 square-foot basement together with an 1100 square-foot garage. Construction on the marital home was financed with two loans. The first loan, evidenced by a note signed by both parties on March 8, 1996, was in the original amount of $875,000.00 and was secured by a thirty-year first mortgage payable to M & T Bank. As of the date of trial, $759,831.00 was due on that loan. The second loan was made by Harbor Bank and has a current balance of $165,970.00; it is secured by a fifteen year mortgage on the marital home. This second loan was obtained in Mr. Lee's name alone. Even though the marital home, as constructed, was a true "show place," the parties elected to make additional renovations and improvements. In 2002 they initially planned to add a pool, pool house, stairs to the deck, and to enlarge the closets in the master bedroom. But those initial plans expanded into what turned out to be an extremely ambitious and foolishly expensive renovation project. As revised, the plans called for removing the brick off of the entire exterior of the house and replacing the brick with limestone. The revised building plans also called for building a theater, a new garage, replacing the existing roof with one made of slate, and building a gym big enough to include a basketball court.

Construction began in July of 2003 and continued until the time the parties separated in May of 2004. After the parties separated, Dr. Andochick signed, as did Mr. Lee, documents necessary to obtain a $1,000,000.00 line of credit with Mercantile Safe Deposit and Trust Company as a bridge loan until a $5,000,000.00 permanent loan could be secured to finance the cost of construction.

Subsequently, Dr. Andochick refused to execute the necessary documents to obtain the $5,000,000.00 loan. Due to Dr. Andochick's refusal, construction stopped on the residence.

Even though 1.65 million dollars has been spent for the enlargement and "improvement" to the property, the marital

home currently remains unfinished. Approximately 19–20,000 square feet of space is under roof but most of it has no heating or air-conditioning. Floors are made of concrete or plywood, and most of the exterior of the house is covered in Tyvec construction paper.

The only habitable parts of the house are the master bedroom and a bathroom on one level, and a study and bar-kitchen on another level. The gymnasium remains incomplete. It is estimated that it will cost another $4,500,000.00 to complete the renovations.[2]

Mr. Lee continues to live in the marital home even though it only has a few habitable rooms. The value of the land and house is $1,400,000.00. But, because the debt associated with the marital home far exceeds its appraised value, the court gave it a value of zero for purposes of determining its marital property value.

Since the parties separated in 2004, Dr. Andochick has lived in a house in Frederick with her two children. The house is worth $650,000.00, and Dr. Andochick pays rent for the house in the amount of $2,500.00 per month.

### III.

### 7802 Fingerboard Road

About four months prior to his marriage to Dr. Andochick, Mr. Lee bought 8.5 acres of land on Fingerboard Road from the estate of his great-grandfather, John Lee. This land was

---

**2.** There are two other loans in Mr. Lee's name alone that relate in whole or in part to the uncompleted house expansion. The first is a loan payable to Mercantile Bank, dated November 9, 2004, in the amount of $450,000.00, which has a principal balance of $225,000.00. Mr. Lee's payment on the Mercantile Loan includes quarterly interest payments and six semi-annual principal payments, five of which are $75,000.00 and the last of which is $76,086.99 that was due on January 1, 2008. The second debt is a Harbor Bank Line of Credit with $2,300,000.00 outstanding debt, of which $1,412,905.00 is attributable to the house. The Harbor Bank line of credit matured on January 12, 2006, and was overdue as of the date of trial. Mr. Lee pays monthly interest of $14,854.00 on the line of credit.

later subdivided into two parcels. One parcel, approximately 7.5 acres in size, is the land on which the marital home was built. The second parcel, approximately one acre in size, is the property now known as 7802 Fingerboard Road.

In conjunction with his acquisition of the land, Mr. Lee promised to build a home on the property where his grand-mother, great-aunt, and their brother could live for the rest of their lives. About six months after the marriage, Mr. Lee obtained quitclaim deeds to the 8.5 acres from several other heirs of his late great-grandfather. In exchange for the quitclaim deeds, Mr. Lee paid some of the heirs a sum of money. The amounts paid ranged from $5,000.00 to $7,000.00, although the precise amount expended for the quitclaim deeds was not revealed in the record.

In 1994, approximately, construction commenced on the home where Mr. Lee's relatives were to live. Dr. Andochick and Mr. Lee financed the construction of the house by obtain-ing two loans, one in the amount of $150,000.00 and a second in the amount of $118,000.00, each to mature in 2025.

The court found that the fair market value of 7802 Finger-board Road is $540,000.00. Of that latter figure, $250,000.00 represents the value of the land, and the remaining $290,000.00 represents the value of the house. As of the date of trial, the loans taken out by the parties to finance the building of the house had a current total balance of $233,327.00, and Mr. Lee currently pays mortgage payments on those loans of $2,472.00 per month.

Additional facts will be set forth in order to answer the questions presented.

## IV.

### Analysis

### A. Did the trial court err in finding that Mr. Lee could afford to pay $10,000.00 per month in alimony?

Mr. Lee claims that the trial judge erred in awarding Dr. Andochick indefinite alimony in the amount of $10,000.00 per

month. His argument is based on five separate contentions, viz: 1) the trial court erred in finding that Mr. Lee could afford to pay indefinite alimony in the monthly amount of $10,0000.00; 2) Dr. Andochick failed to meet her burden of proving entitlement to indefinite alimony because she did not show that unless an award of indefinite alimony was granted her standard of living, when compared with that of Mr. Lee, would be unconscionably disparate; 3) even if, hypothetically, Dr. Andochick's evidence was sufficient to allow a finder of fact to conclude that her post-divorce standard of living would be unconscionably disparate with that of Mr. Lee, the trial judge never found that the standard of living would be unconscionably disparate; 4) an award of indefinite alimony was not warranted in light of the fact that the trial judge did not find that Dr. Andochick needed $10,000.00 per month, nor did the evidence support a conclusion that such a need existed; 5) in awarding indefinite alimony, the trial court failed to take into consideration the income Dr. Andochick would receive from the payment of the monetary award and the sale of jointly owned property.

Prior to concluding that an award of indefinite alimony was warranted, the trial judge made extensive findings of facts as to each of the factors set forth in Md.Code (2006 Repl.Vol.), § 11–106(b) of the Family Law Article ("FL"). In this regard, the court found, *inter alia*, the following: 1) Dr. Andochick, at present, is "essentially self-supporting" and has been throughout the marriage; 2) Dr. Andochick presently is engaged in "suitable employment" and has obtained "sufficient education and training for [her] self-support"; 3) both parties made substantial financial contributions to the well-being of the family but Dr. Andochick has also made substantial non-monetary contributions by supporting Mr. Lee's professional advancement and by running the household, albeit with outside domestic help; 4) many causes led to the estrangement of the parties, but some of the major ones were that: a) Mr. Lee was secretive about family finances and resisted efforts by Dr. Andochick to inform herself about such matters, and b) Mr. Lee was controlling to such a degree that his wife was

frequently withdrawn in his presence but outgoing when he was not around; 5) many of the expenses listed by Mr. Lee on his financial statement were not reasonable; 6) Mr. Lee owes creditors almost $6,000,000.00, of which Dr. Andochick is jointly liable for $993,158.00; 7) Mr. Lee has a retirement fund worth $492,248.00 whereas Dr. Andochick's retirement fund is only worth $44,745.00.

None of the findings, just mentioned, are disputed for purposes of this appeal. The court made several other findings that are disputed, which will be discussed *infra*.

At trial, Mr. Lee introduced evidence showing that his debt obligations required him to pay out $69,045.00 per month. That latter figure assumed that he would have to make regular payments of principal and interest of $34,997.00 per month to Mr. Brown, whom he owed over $2,000,000.00 on a promissory note. The trial court concluded that due to the close personal relationship between Mr. Lee and Mr. Brown, the latter would allow Mr. Lee to pay only interest on the note until it came due in September 2011. Accordingly, the court reduced by $27,967.00 Mr. Lee's claim of monthly debt payment obligations. But even with that reduction, the total monthly debt obligation to Mercantile Bank, Harbor Bank and Mr. Brown amounted to $41,078.00 per month or $492,936.00 annually. Mr. Lee also was obligated to pay $11,971.00 in monthly mortgage payments for loans that encumbered the two Fingerboard Road properties. These mortgage payments totaled an additional $143,652.00 annually. Thus, the total annual debt obligation of Mr. Lee was $636,588.00. Given the fact that Mr. Lee's after-tax income was $998,000.00, this would leave him with only $361,412.00 ($998,000.00 less $636,588.00) annually to support himself and pay child support and alimony.

■ It would cost Mr. Lee $72,000.00 per year ($120,000.00 × 60%) in after-tax dollars to pay Dr. Andochick $10,000.00 per month alimony. Additionally, child support payments of $180,000.00 per year plus other court imposed obligations (cost of private school, etc.) of $26,400 ($2200.00 per month × 12)

would mean that he was obligated to use, all told, $278,400.00 annually of after-tax dollars to pay Dr. Andochick what the court ordered. This would leave Mr. Lee with only $83,012.00 ($361,412.00 less $278,400) for personal expenses and nothing with which to pay the five annual $250,000.00 payments he was to make to satisfy the $1,250,000.00 monetary award.

In calculating reasonable living expenses, the court carefully scrutinized Mr. Lee's claim that he had monthly expenses, excluding debt service, of $26,008.00. There were numerous items in one section of the financial statement, which totaled $15,897.00 per month, that the court found unreasonable. The court reduced that figure by 50%, i.e., down to $7,948.50. The court also reduced by half the $2,800.00 per month Mr. Lee estimated he spent for utilities (propane gas) and the $1500.00 per month budgeted for home repairs. With these deductions, the court concluded that Mr. Lee's reasonable non-debt living expenses were $15,909.50 per month or $190,914.00 per year. Lastly, the trial judge concluded that if one deducted, as he had done, the unreasonable expenses mentioned above and also deducted the amount of principal owed to Mr. Brown that would not have to be paid, then Mr. Lee would "have sufficient income to pay alimony and child support" as well as sufficient money to pay his personal living expenses.

Mr. Lee argues that the trial judge "did not do the math" when he reached the aforementioned conclusion. We agree.

In support of the trial judge's ruling that Mr. Lee could afford to pay the alimony and child support awarded, plus his debt obligations, Dr. Andochick first emphasizes that many of the personal living expenses estimated by Mr. Lee on his financial statement were found by the court to be excessive. This is true. But the court, taking into consideration the excessiveness of Mr. Lee's estimates, reduced the figure for reasonable expenses to $15,909.50 per month.

Dr. Andochick does not attempt to refute the fact that Mr. Lee's ongoing debt obligations are as calculated by Mr. Lee. She simply points out that part of the debt obligation totaling $9,490.00 per month is for the two properties located on

Fingerboard Road that are titled solely in Mr. Lee's name. Although this is true, we fail to see how this in any way supports Dr. Andochick's argument that the trial judge did not err when he found that Mr. Lee had the ability to pay $10,000.00 per month alimony after paying his child support and debt obligations as well as his personal living expenses.

Dr. Andochick further argues:

The trial court found that the Husband had the ability to pay alimony to the Wife. The court discussed the Husband's projected earnings for 2006 and his extensive earnings history. In addition, the court noted that some of the decrease in the Husband's income was attributable to the Husband's preoccupation with the divorce proceeding. The court also discussed the expenses and debts listed on the Husband's financial statement. The trial court also found that the Husband could restructure the repayment of his debts. For example, based on the testimony and exhibits introduced, the court found that the Husband could pay interest only on the large debt to Mr. Brown, despite the Husband's desire to pay principal and interest. Again, the Wife testified that she was unaware of the amount of debt to Mr. Brown. The Husband also testified that he was waiting until after the divorce trial to restructure the loan from Harbor Bank and was considering converting the loan from interest only to interest and principal.

The first three sentences in the aforementioned argument suggest that the trial judge found that appellant could earn more than the amount projected for 2006, i.e., $1,760,282.00. If the trial judge thought that appellant could earn more than the projected amount, he did not say so, nor can it be inferred, legitimately, from what he did say, that he thought that in the future he would exceed the $1,760,282.00, 2006 projected income figure.

It is true, as Dr. Andochick points out, that the trial court found that Mr. Lee could restructure the repayment of one of his debts, i.e., the debt due to Mr. Brown. This finding was not clearly erroneous and has been taken into consideration by

us. But the trial judge did not find that Mr. Lee could restructure any of his other debts so that he could have more cash on hand.

Dr. Andochick points out that Mr. Lee testified that he hoped to convert his interest only line of credit into a conventional loan after the divorce. But it simply does not follow, as Dr. Andochick's brief suggests, that Mr. Lee's monthly payments would be any less or that he could borrow any more from the bank so as to lighten his monthly debt obligations.

As shown above, while Mr. Lee cannot afford to pay $27,200.00 monthly in combined alimony, child support, and school tuition if he expends $190,914.00 per year for his personal living expenses, he could afford to pay alimony and child support in those amounts if he reduced his personal living expenses to $83,012.00 annually (approx. $6,918.00 per month).[3] This certainly is not impossible because a majority of the population in this country lives on far less. But if Mr. Lee has $83,012.00 annually to spend for personal expenses and Dr. Andochick has $203,000.00, it is obvious that Dr. Andochick's life style will not be unconscionably disparate when compared with that of her ex-spouse.

## V.

**Did Dr. Andochick Meet Her Burden of Proving That Without an Award of Alimony, Her Standard of Living, When Compared to Mr. Lee's, Would Be Unconscionable Disparate?**

The trial court's decision to grant Dr. Andochick's request for indefinite alimony was based on section 11–106(c)(2) of the Family Law Article, which reads in pertinent part: alimony may only be awarded indefinitely if "the court finds that . . . even after the party seeking alimony will have made as much

---

**3.** Our statement that Mr. Lee could afford alimony and child support payments as ordered would not be true unless Mr. Lee devises a plan to pay from some source other than current income the five annual installments due on the $1,250,000.00 monetary award.

progress of becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate."

Mr. Lee asserts that the trial court "failed to find the parties' standard of living would be unconscionably disparate" if an award of indefinite alimony were not granted. In the alternative, he contends that even if we were to find that the trial court impliedly concluded that there would be an unconscionable disparity in the standard of living following a divorce, the record in this case fails to support such an implied conclusion.

In reaching his decision, the trial judge recognized that because Dr. Andochick was self-supporting, he could not award indefinite alimony unless he found, post-divorce, that the standard of living of the parties would be unconscionably disparate. The court also recognized, *citing Solomon v. Solomon*, 383 Md. 176, 198, 857 A.2d 1109 (2004), that an award of indefinite alimony could not be granted simply by comparing the relative percentages of gross or net income of the parties. Nevertheless, the trial judge went on to say:

> [T]he relative percentages in unconscionable disparity cases offer some guidance in identifying an unconscionable disparity. Plaintiff's current income is $267,000.00 per year and the court declines to impute additional income. Defendant's projected 2006 income is $1,760,282.00. Plaintiff's income is 15% of Defendant's income. The disparity of income between Plaintiff and Defendant is greater than the disparity of incomes in cases cited by the Court of Appeals in *Solomon* (16%–46%) where an unconscionable disparity was found.

> [Mr. Lee] cites *Karmand v. Karmand*, 145 Md.App. 317, 802 A.2d 1106 (2002) to support his assertion that any disparity between the parties (self-supporting) incomes is not unconscionable. The Court of Special Appeals opinion in that case is helpful, but not for the reason urged by the Defendant. In *Karmand*, the court endorsed Judge Sundt's analysis in determining that indefinite alimony was not

called for. Judge Sundt described the analytical steps the trial judge must take:

In plain English, unconscionably means, "morally unacceptable ... Shocking." ... Furthermore, [a] finding of mathematical disparity will not automatically trigger an award of indefinite alimony ... the court must apply equitable considerations on a case-by-case aided by several factors. The standard of living of the parties must be considered as well as how and when that standard was acquired. Additionally, the assets of the parties and whether a monetary award was given impact the decision awarding alimony.

[Dr. Andochick's] financial and non-financial contributions of the well-being of the family enabled them to establish the standard of living which they achieved. [Mr. Lee] has applied his considerable talents and efforts to earn an income far above the reach of most people. That he would do so as a husband and father has been made possible with the contributions of [Dr. Andochick].

The parties have enjoyed an income which has enabled them to live without significant limitation on their discretionary spending. While [Dr. Andochick] can clearly be self-supporting, she can resume a portion of the standard of living of the parties only with alimony from [Mr. Lee].

The court finds that $10,000.00 per month indefinite alimony is an appropriate amount to be paid to the Plaintiff by the Defendant commencing January 1, 2007.

(Citations omitted.)

As Mr. Lee stresses in his brief, the trial judge did not say in his opinion that the standards of living post-divorce would be unconscionably disparate unless an award of indefinite alimony was granted. But since the trial judge was obviously familiar with the applicable standard, he impliedly made such a finding. Nevertheless, the court's opinion provides only one clue as to how it arrived at that [implied] finding, viz: the huge differences in the parties' gross incomes.

Mr. Lee, *citing Hart v. Hart*, 169 Md.App. 151, 169–70, 899 A.2d 965 (2006), claims the judge's failure to explain how he

concluded that the respective standards of living would be unconscionably disparate constituted reversible error. In *Hart*, Judge Adkins, speaking for this Court, said:

Just as it is error to deny a request for indefinite alimony "without explicitly discussing the disparity issue," *see Kelly v. Kelly*, 153 Md.App. 260, 279, 836 A.2d 695 (2003), so too is it error to **grant** such a request without explicitly discussing the disparity issue. *See Brewer v. Brewer*, 156 Md.App. 77, 104–05, 846 A.2d 1, *cert. denied*, 381 Md. 677, 851 A.2d 596 (2004). On remand, the trial court must consider the disparity in Cynthia's and James's incomes after Cynthia obtains a certified teaching position. *See Solomon*, 383 Md. at 198, 857 A.2d 1109.

*Id.* at 170, 899 A.2d 965 (footnote omitted).

Dr. Andochick counters with the following argument:

As this Court has stated, "The trial judge need not articulate each item or piece of evidence she or he has considered in reaching a decision. . . . The fact that the court did not catalog each factor and all the evidence which related to each factor does not require reversal." *John O. v. Jane O.*, 90 Md.App. 406, 429, 601 A.2d 149 (1992). In *Beck v. Beck*, this Court stated as follows:

We "presume that the trial judge knows the law," *Reuter v. Reuter*, 102 Md.App. 212, 244, 649 A.2d 24 (1994), and in the case at bar, the trial court tells us so by stating that it was awarding counsel fees "because of the obvious necessity of prosecuting this action for alimony. . . ." The substance of the trial court's opinion is that it found that there was substantial justification for litigating the alimony claim, but because the court was making a monetary award, it believed alimony was no longer necessary. A trial court does not have to recite any "magical" words so long as its opinion, however phrased, does that which the statute requires.

*Beck v. Beck*, 112 Md.App. 197, 212, 684 A.2d 878 (1996).

Nothing in the record causes us to doubt that the trial judge knew the applicable law. But knowledge of the law does not

obviate the requirements set forth in *Hart,* that the court discuss how, in the court's opinion, the living standards would be unconscionably disparate absent an award of indefinite alimony. Failure to provide such an explanation is especially problematic in this case because, as stated in *Quinn v. Quinn,* 11 Md.App. 638, 643, 276 A.2d 425 (1971), "[t]he husband's overall financial ability to support (and not merely his current income)" is one of the controlling factors in determining whether an award of alimony should be made.

In sum, it would have been useful if the court had given us the benefit of its analysis as to how it arrived at the conclusion that, without an award of alimony, the parties' respective standards of living would be unconscionably disparate. But this is not outcome determinative.

■ Mr. Lee argues, and we agree, that even if the trial judge impliedly made a finding of unconscionable disparity in the standards of living of the two litigants and even if the court had explained that finding, reversal would still be required because Dr. Andochick did not meet her burden of producing evidence to support a finding that post-divorce the living standards of the parties would be unconscionably disparate.

Dr. Andochick introduced into evidence a financial statement showing that her *current* actual expenses for herself were $10,022.00 per month and $17,687.50 per month for her children. She also submitted an aspirational budget showing anticipated monthly expenses of $22,468.00 for herself and $17,060.00 for her children. That aspirational budget included an anticipated payment of $4,700.00 per month to cover taxes in the event that the court awarded her $20,000.00 per month in alimony—which she had requested. Thus, under her aspirational budget, if no alimony was awarded, she would need after-tax income of $17,760.00 per month or $213,216.00 annually, which is only about $10,000.00 per year less than she currently nets. That relatively small deficit could be surmounted if she reduced her vacation budget from $36,000.00 per year to $26,000.00 annually.

The aspirational budget anticipated that she would purchase a $1,200,000.00 home encumbered by a $1,000,000.00 mortgage, payable over 30 years at a 7% interest rate. The projected mortgage, insurance, and real estate taxes reflected in the budget was $7,500.00 per month—in contrast to the $2,500.00 she is currently paying in rent.

The trial court found that some of her projected monthly expenses were "excessive," such as a $2,250.00 per month expense for lawn care and snow removal, ($1,000.00 per month for gas and electric bill), and $3,000.00 per month to purchase household furnishings even though the joint financial statement showed that Dr. Andochick presently owns furnishings worth $59,990.00. The court went on to say, however, that "although those expenses may appear large, ... [they nevertheless] reflect the substantial standard of living which the parties achieved."

While the trial judge did not say so explicitly, his opinion makes it clear that he believed that Dr. Andochick's aspirational budget reflected the high standard of living established during the marriage. In this regard it is significant that Dr. Andochick did not testify as to anything that would be missing from her prior lifestyle, if she could put into effect her aspirational budget. Nor did she produce evidence (other than the showing as to each party's gross income) that could conceivably lead to the conclusion that her post-divorce standard of living would be unconscionably disparate to that of Mr. Lee without the grant of indefinite alimony. What the evidence showed was that the current lifestyle of Mr. Lee is not in any way superior to the standard reflected in Dr. Andochick's aspirational budget. After all, it was undisputed that Mr. Lee lives in a house that is uninhabitable except for a few rooms and he is saddled with a huge debt. Moreover, his largest asset (stock in Brown Capital) is not readily marketable.

In her brief, Dr. Andochick, of course, seeks to have us uphold the alimony award. But in doing so, she fails to explain how her standard of living would be unconscionably disparate if no alimony award was made. Instead, she focus-

es, as did the trial judge, on the disparity in percentages of gross income. But proof of a disparity in gross income is not enough to show a disparity in standard of living. *See Whittington v. Whittington*, 172 Md.App. 317, 339–40, 914 A.2d 212 (2007) (vacating and remanding award of indefinite alimony where trial court considered only length of marriage and disparity in incomes); *Brewer v. Brewer*, 156 Md.App. 77, 105, 846 A.2d 1 (2004) (vacating and remanding judgment where trial court only considered disparity in assets and not disparity in standard of living).[4]

For the reasons stated above we shall reverse the trial court's award of indefinite alimony.[5]

## VI.

### Monetary Award

 Mr. Lee does not contend that the trial court was clearly erroneous in determining that Dr. Andochick was entitled to a monetary award in the amount of $1,250,000.00.

---

**4.** Mr. Lee also argues that the trial court erred in not crediting Dr. Andochick with income from the payment of the monetary award and the anticipated sale of jointly owned property. Among the parties' assets were unencumbered real property having a value of $975,000.00, titled in the names of Mr. Lee and Dr. Andochick jointly, together with jointly titled personal property having a value in excess of $600,000.00.

Dr. Andochick points out, correctly, that the trial judge specifically stated that he *did* consider the monetary award granted to her in awarding alimony. The opinion also makes clear that the judge considered the joint assets of the parties. We cannot fault the trial judge for failing to impute interest income from the sale of these jointly owned assets, because the court was provided with no evidence as to the amount of income that could likely be generated from those assets. *See Newman v. Newman*, 71 Md.App. 670, 676, 527 A.2d 61 (1987) (the chancellor need only consider the future income to be generated from investment of the monetary award when evidence is presented on this issue.).

**5.** In reversing the indefinite alimony award for failure to prove disparity in standards of living, we recognize the exceptional debt burden facing Mr. Lee. The debt was incurred with the concurrence of Dr. Andochick even after the parties' separation, until she refused to sign off on the $5,000,000 bridge loan. These facts were significant in our standard of living analysis.

He does contend, and we agree, that the reversal of the indefinite alimony award requires us to vacate the monetary award. *See Malin v. Mininberg,* 153 Md.App. 358, 425, 837 A.2d 178 (2003) (vacating monetary award for new evaluation due to disposition of the alimony award); *see also Alston v. Alston,* 331 Md. 496, 509, 629 A.2d 70 (1993) (remanding alimony issue requires vacating of monetary award); *Turner v. Turner,* 147 Md.App. 350, 400, 809 A.2d 18 (2002) (same).

Upon remand, the trial judge should reconsider the amount of the monetary award to which Dr. Andochick is entitled in light of the fact that the award of indefinite alimony has been reversed.

■ In his brief, Mr. Lee contends that the trial court erred in making the monetary award payable over only five years because he does not have the ability to make the payments that quickly. We need not resolve this issue. We point out, however, that "the method of payment of a monetary award is committed to the sound discretion of the trial court." *Innerbichler v. Innerbichler,* 132 Md.App. 207, 242, 752 A.2d 291 (2000). Nevertheless, "the 'terms of the payment must be fair and equitable,' and the court should consider the method of payment in light of the payor's ability to pay." *Id.* at 243, 752 A.2d 291 (*quoting Caccamise v. Caccamise,* 130 Md.App. 505, 523, 747 A.2d 221 (2000)).

In the trial judge's discretion, upon remand, the court may allow additional evidence to be introduced concerning Mr. Lee's ability to pay whatever monetary award is made over a longer period of time. We say this because in view of Mr. Lee's profession and the current "Bear" Wall Street Market, it is at least possible that Mr. Lee's ability to pay the monetary award over a five year period may have changed since the date of trial.

On remand, the court should consider whether Dr. Andochick is entitled to a greater monetary award and should reconsider as well the time period in which he must pay that award.

## VII.

### Child Support

Mr. Lee next argues that the trial court did not apply the correct legal standard in setting the amount of child support. As mentioned earlier, the trial judge ordered Mr. Lee to pay $15,000.00 per month in child support plus $2,243.00 per month for the cost of private school tuition, transportation and other child rearing expenses. The court explained its reasons for ordering child support in that amount as follows:

In exercising discretion to determine child support, some courts have extrapolated from the Child Support Guidelines mathematically. In this case, that process would yield the result in excess of $12,500.00 per month. *At the time of trial, the Defendant was paying $15,000.00 per month in child support.* He also claimed that he was paying the costs of tuition and transportation for the childrens' private school in the amount of $2,243.00 per month. The Plaintiff claimed expenses on behalf of the children in the amount of $17,060.00 per month, including expenses of private school (tuition, transportation, clothes and uniforms, lunch and extracurricular activities) of $2,265.00.

*The best evidence of the needs of the children and the ability of the Defendant to pay support is the practice established by the parties. The appropriate amount of child support is $15,000.00.* The Defendant shall also pay the costs of the childrens' private school, including tuition, transportation, lunch and fees for extracurricular activities in which or similar to which, the children are involved, but not to include the costs of uniforms or other clothing.

In determining the amount of child support, the court has considered that the parties have agreed in practice that private education is appropriate for their children. The court is aware that the Defendant has paid the amount of child support and school expenses as noted when he had not been required to pay alimony. As noted above, the Maryland Child Support Guidelines do not apply in this case, but the sense of those Guidelines is to take into account alimony

payments which a party is ordered to pay. The court has separately determined that alimony in the amount of $10,000.00 per month is appropriate and has considered that obligation of the Defendant in determining child support. (Emphasis added.)

■ The award of child support in the total amount of $17,243.00 per month cannot be sustained on the grounds stated by the trial judge. The court's conclusion was based on a false premise i.e., the premise that Mr. Lee, prior to the divorce hearing, had been paying $15,000.00 per month in child support plus school expenses. At trial it was undisputed that Mr. Lee had been paying Dr. Andochick $15,000.00 per month for combined unallocated family support, including spousal support, and not just support for the children.

Because the award of child support was based on a false factual premises, it must be vacated.

Mr. Lee also argues that the trial court erred in not allocating the child support between the parties based on their respective annual incomes. (*citing Voishan v. Palma,* 327 Md. 318, 330–31, 609 A.2d 319 (1992)). *See also Frankel v. Frankel,* 165 Md.App. 553, 578, 886 A.2d 136 (2005); *Tucker v. Tucker,* 156 Md.App. 484, 491, 847 A.2d 486 (2004); *Malin v. Mininberg,* 153 Md.App. at 410–11, 837 A.2d 178. We agree with Mr. Lee on this point.

■ The amount of child support awarded was slightly more than the amount which Dr. Andochick sought in her aspirational financial statement. Although Mr. Lee should shoulder the majority of the child support burden because he earns so much more than his ex-wife, it was an abuse of discretion for the trial court to fail to place any of the child support burden on Dr. Andochick, who enjoys a very substantial annual income.

■ Mr. Lee also argues that the trial court should have taken into account, in setting child support, the fact that "the children would be spending 42% of the overnights" with him. In response, Dr. Andochick first points out that the parties'

youngest child was not regularly spending overnights with Mr. Lee. She also points out, relying on section 12–201(k)(2) of the FL Article, that the court has discretion as to whether to base a child support award on shared physical custody. We agree with Dr. Andochick as to both of these points.

For all the above reasons, the award of child support, plus the award for school expenses, transportation costs, etc. for the children shall be vacated and the matter remanded to the circuit court for further consideration.

## VIII.

### Cross Appeal

### A. Value of the Marital Home

Dr. Andochick argues that the trial court's finding that the marital home and 7802 Fingerboard road property was Mr. Lee's non-marital property was clearly erroneous.

The trial court found that the interest in the *land* known as 7700 Fingerboard Road (the 7.5 acres where the marital home was built) and the smaller one acre parcel known as 7802 Fingerboard Road were acquired by Mr. Lee prior to the marriage, and were primarily non-marital because Mr. Lee acquired the deed to the land prior to the marriage. The court considered the improvements to the land, which were made after the marriage, as marital property.

The trial judge recognized that the interest Mr. Lee acquired in the two parcels of land by quitclaim deed after the marriage constituted marital property. The court correctly observed, however, that Dr. Andochick "offered no proof as to the value of the respective interest" in the land that was conveyed by Mr. Lee's relatives *via* the quitclaim deeds. Thus, the trial judge concluded that although the two parcels of land "may be part marital and part non-marital" it is impossible to ascertain the proportion that is marital. In the trial judge's view, Dr. Andochick had failed to meet her burden of establishing which property was marital or to establish its value. We agree with the trial judge's analysis in

regard to this issue. Although Dr. Andochick spends several pages in her brief attempting to persuade us that the trial judge was erroneous in his finding, the bottom line is that nothing in her brief rebuts the trial judge's conclusion that Dr. Andochick had failed to meet her burden of establishing the value of the portion of the land that was non-marital.[6]

## B. Mr. Lee's interest in an airplane

Prior to 2002, Brown Capital purchased an interest in an airplane. In 2002, Mr. Lee using $310,000.00 of marital funds, bought the right to use the corporate jet for 25 hours a year. According to the evidence, the interest Mr. Lee purchased was similar to the interest that is obtained when someone buys a time share in real property.

The trial court concluded that Mr. Lee's interest in the airplane had zero value for purposes of determining the value of the marital property held by each party. The court explained:

> [Mr. Lee] has utilized the services of the aircraft on occasion. The parties traveled with their children to New York, and in April of 2006, [Mr. Lee] flew to Miami with friends. The cost of fuel, pilot time and other overhead was $3,500.00 and $15,000.00 respectively. Given the expense of utilization over and above the cost of the fractional share, there really is no value to be assigned to the purchased right to use the aircraft. Travel by that means far exceeds the cost of even first class airfare on commercial flights. There was no evidence that the right to use the aircraft was assignable, let alone assignable for any consideration. If indeed the right to use the aircraft can be characterized as an asset, it

6. The specifics as to what actually was paid to Mr. Lee's relatives to obtain quitclaim deeds was never established. Mr. Lee did testify that he made one or more payments in the range of $5,000 to $7,000.00 to obtain quitclaim deeds but there was no showing that any of his relatives actually claimed title to the property. We further note that nowhere in Dr. Andochick's brief does she provide even a hint as to the dollar amount that she claims the trial judge should have found to be the marital value of the two parcels of land.

has no value in this case. However, the privilege may be considered in assessing the standard of living the parties achieved.

Dr. Andochick makes the following argument:

Since the use of the jet is property that was acquired by the Husband during the marriage in consideration for a payment of $310,000.00, the use of the jet is marital property. The trial court declined to treat the use of the jet as marital property because the court found that it had no value. The trial court erred. In *Otley v. Otley*, 147 Md.App. 540, 558, 810 A.2d 1 (2002), this Court held that the circuit court erred in finding unvested stock options as non-marital property because they had no value at the time of trial. This Court stated, "Despite the fact that an unvested option has no current monetary value, 'it is nonetheless an economic resource, comparable to pension benefits, to which a value can be attributed.'" *See Otley v. Otley*, 147 Md.App. at 556, 810 A.2d 1, *quoting, Green v. Green*, 64 Md.App. 122, 137, 494 A.2d 721 (1985).

When an item of property does not have a definite market value, the cost of the property can be used to determine the value of the property. *See Bailey v. Ford*, 151 Md. 664, 666–68, 135 A. 835 (1927); *Myers v. State*, 137 Md. 491, 493, 113 A. 90 (1921). *See also Karmand v. Karmand*, 145 Md.App. 317, 345–347, 802 A.2d 1106 (2001). Here, the price that the Husband paid to use the jet is sufficient evidence of the value of the use of the jet.

▆▆▆ The trial court declined to treat Mr. Lee's interest in the airplane as marital property because there "was no evidence that the right to use the aircraft was assignable, let alone assignable for any consideration." In this regard, the trial judge did not err.

The Court of Appeals found in *Solomon v. Solomon*, that a party's membership in a country club was non-marital because it "cannot be sold, transferred, exchanged, redeemed, inherited or liquidated in any way." 83 Md. at 206, 34 A. 774. What was said as to a country club membership in *Solomon*, is

equally applicable in this case when there was no indication in the record that Mr. Lee's right in the airplane could be transferred or assigned to a third party.

It is true, as Dr. Andochick points out, that there are occasions when the cost of property can be used to determine the current value of that property. This, however, is not one of those times. The trial court was mindful of this fact when he pointed out that a flight to Miami, using the corporate jet, would cost $18,500.00. In light of such exorbitant costs, it was quite reasonable for the trial judge to conclude that Mr. Lee's interest in the plane was not an asset that could be assigned.

We disagree with Dr. Andochick's contention that the right to use the airplane was analogous to an employee's right to a stock option discussed in *Otley v. Otley*, 147 Md.App. 540, 556, 810 A.2d 1 (2002). The unvested stock options at issue in *Otley* constituted a form of employee compensation and were therefore comparable to pension benefits to which employees are entitled. As Mr. Lee points out in his brief, his right to use the company jet was in no way a form of "compensation" received from Brown Capital. Instead, it was undisputed that Mr. Lee paid $310,000.00 so that the jet could be utilized for his personal use.

Dr. Andochick argues, in the alternative, that the trial court erred in failing to find that Mr. Lee had dissipated the $310,000.00 in marital funds when he purchased an interest in the airplane. "Dissipation may be found where one spouse uses marital property for his or her own benefit for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown." *Sharp v. Sharp*, 58 Md.App. 386, 401, 473 A.2d 499 (1984).

Mr. Lee's payment of $310,000.00 was made in 2002. At that point the marriage between the parties was not undergoing "an irreconcilable breakdown."

Dr. Andochick claims that the $310,000.00 contribution was made in 2004. In support of that contention she makes the following argument:

That debt was carried on the books of the company until the 2004 accounting year. On the 2004 financial statement, published in 2005, almost a year after the parties separated, Brown Capital reported that the Husband had waived his claim to be repaid the debt that the company owed him. By that entry, the $310,000.00 debt disappeared into shareholders' equity, thus extinguishing the debt that the company owed to the Husband. All of this occurred at a time when the marriage was irretrievably broken. The attempt to hide the $310,000.00 investment by the Husband constitutes dissipation of marital property and should have been considered as extant marital property to be included in its monetary award.

It is true, as Dr. Andochick argues, that a bookkeeping change occurred at a point in time when the marriage was "irretrievably broken." But the evidence does not support Dr. Andochick's contention that the bookkeeping changes constituted an attempt to hide the $310,000.00 investment by Mr. Lee. Instead, according to the testimony of Eddie Brown, which was uncontradicted, the original bookkeeping entry was a mistake and the $310,000.00 should never had been carried on the company books as a debt. The mistake was corrected in 2004. Under the circumstances the trial court did not err in failing to find dissipation of marital assets on Mr. Lee's part.

### C. The Value of the Marital Home

The trial court found that the property located at 7700 Fingerboard Road had no value for purposes of calculating a monetary award because the debt incurred in making the substantial changes to the property in 2003 and 2004 far exceeded the $1,400,000.00 value of the property. Dr. Andochick contends that the trial court erred in valuing the marital home at zero, because the debt incurred in making changes to the property did not relate to the "acquisition" of that property.

Marital debt has been defined as "a debt which has been directly traceable to the acquisition of marital property." *Schweizer v. Schweizer*, 301 Md. 626, 636, 484 A.2d 267 (1984). The marital property value of an asset is adjusted downward by the amount of the marital debt. *Id.* at 637, 484 A.2d 267. Conversely, a non-marital debt is a debt which is not directly traceable to acquisition of marital property. *Id.*

The marital home located at 7700 Fingerboard Road had a value of $1,400,000.00. Two loans were obtained before 2003, both of which were in connection with the original construction of the residence. The balance of the first mortgage on the property was $759,831.00 and the balance on the second mortgage was $165,970.00 for a total of $925,801.00. Dr. Andochick contends that what the court should have done is subtract $925,801.00 from the current value of $1,400,000.00 and conclude that the property had a marital property value of $474,199.00 ($1,400,000.00 less $925,801.00).

Dr. Andochick argues that the trial court erred when it included in the amount of marital debt the sum of $1,637,905.00, which was the debt incurred to make changes to the house made in 2003 and 2004. She points to expert testimony introduced at trial showing that the marital property would have been worth $1,700,000.00 if no improvements had been made. Therefore, the money spent after 2002 decreased the value of 7700 Fingerboard Road.

Because a marital debt "is one directly traceable to the acquisition of marital property and is to be subtracted from the market value of that property in determining its marital property value," *Randolph v. Randolph*, 67 Md.App. 577, 586–87, 508 A.2d 996 (1986), the issue to be decided is whether the sum of $1,637,905.00 constituted monies "traceable to the acquisition of marital property." Although there is no Maryland case directly on point, we construe the phrase "marital debt" to include monies borrowed to make improvements to marital property—whether the borrowed funds that were utilized ultimately enhances the value of the marital property or not. Any other construction would be unfair and

would be at odds with the central purpose for making a marital award, i.e., to make an *equitable* distribution of marital assets. This case illustrates the point because, under Dr. Andochick's theory, Mr. Lee will have to pay over $1,600,000.00 in debt directly traceable to the "improvements" made to the marital home while the amount of marital property, theoretically available for distribution, would go up by almost $500,000.00. Under the circumstances, it simply cannot be said that the $500,000.00 (approximately) "was available for purposes of equitable distribution" as Dr. Andochick argues.

**JUDGMENT AWARDING ALIMONY TO LORI ANDOCHICK REVERSED; JUDGMENT GRANTING MONETARY AWARD AND CHILD SUPPORT TO LORI ANDOCHICK VACATED AND CASE REMANDED TO THE CIRCUIT COURT OF FREDERICK COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THE VIEWS SET FORTH IN THIS OPINION; ALL OTHER PARTS OF THE JUDGMENT ENTERED BY THE CIRCUIT COURT ON JANUARY 23, 2007, AFFIRMED; COSTS TO BE PAID BY LORI ANDOCHICK.**